[CONSTRUCTION OF STATUTE.]

## OTIS, *Plaintiff in Error*,
### *against*
## WALTER, *Defendant in Error*.

Under the embargo act of the 25th of April, 1808, c. 170. [lxvi.] s.
11. the collector is protected in the honest exercise of his discretion
in detaining the vessel, and securing both vessel and cargo, until
an actual termination of the voyage.

Whether the voyage has terminated, is a question of fact, and if the
voyage be *colourably*, but not *really* terminated, the collector may
detain the vessel, if he has honest suspicions.

ERROR to the Supreme Judicial Court of
the State of Massachusetts. This is the same
cause which was formerly before this Court.[a]

*Feb. 9th.*      It was argued at this term by the *Attorney
General* and Mr. *Blake*, for the plaintiff in error,
and by Mr. *Webster* and Mr. *Read*, for the de-
fendant in error.

*Feb. 13th.*      Mr. Justice JOHNSON delivered the opinion of
the Court.

This cause is brought up, by writ of error, from
the Supreme Judicial Court of Massachusetts,
for the purpose of reviewing a judgment of that
Court, given in favour of the defendant here,
upon an action of trover instituted in that State,

---

a *Vide ante*, S. C. Vol. II. p. 18.    Vol. VI. p. 583.

to recover damages for the alleged conversion of sundry articles composing the cargo of the sloop Ten Sisters. Otis, in the capacity of collector of the District of Barnstable, had, in the year 1808, seized and detained the vessel and cargo under the provisions of the embargo act of the 25th of April in that year.

1826.

Otis
v.
Walter.

This is the third time that this cause has been brought to the notice of this Court. In the two former instances, it came up upon bills of exceptions, and in both the decisions of that Court were reversed, and a *venire facias de novo* awarded. In the present instance, a special verdict has been taken, and, as the law was settled in the two former decisions, that until the termination of the voyage the collector was protected in the honest exercise of an unlimited discretion in detaining the vessel, and, by necessary consequence, in resorting to the ordinary and necessary means of securing and preserving both vessel and cargo, this verdict seems to be drawn up with a view to bring up the single question, whether, in the sense of the laws of Congress, and of the decisions of this Court, this voyage was not, in effect, terminated before the seizure.

The general question of law having been settled when this case was formerly before the Court, (*ante* vol. II. p. 18. Vol. VI. p. 583.) the question now to be determined is, whether the voyage had really terminated.

The special verdict finds, that the vessel cleared out "*for the port of Yarmouth.*" It is true, the captain, in the oath attached to his manifest, makes use of the mere indefinite expression "bound for Yarmouth." But, when we come to examine the sense in which he made this oath, by referring to his instructions, which are also

found by the verdict, we find it restricted to a voyage to Bass river, where it was to terminate by landing his cargo, and storing it in a particular warehouse. This, then, was the point of his destination, call it port, harbour, place, or what we will. And, as the collector uses the definite, instead of the indefinite article, before port, in the clearance, the fair inference is, that the clearance was for Bass river, under the designation of " the port of Yarmouth."

We are far, however, from intending to intimate, that if the captain's oath as to his destination could not be modified and explained by reference to his instructions, it might be permitted to enlarge the meaning of the word port as used in the clearance, so as to embrace the township of Yarmouth. In those times, when it behooved every public officer to be on the alert against the multiplied evasions of the system of that day, it is not to be supposed, that the definite language of the clearance was adopted without an object. The captain appears to have acted as if he had received a clearance on a general voyage to Yarmouth, whereas, it is obvious, that the collector of Ipswich acted under a sense of the impropriety of giving a clearance that would leave the *terminus* of the voyage so void of precision. We consider the definite article as having been used for a definite purpose, and to preclude the general privilege of sailing to any point in the town or township of Yarmouth, at which a landing might have been effected.

It is obvious, indeed, from the whole tenor of

the verdict, that the mouth of Bass river is understood more emphatically to be the port of Yarmouth than any other place in the township of Yarmouth. In one place it finds, " that the harbour or port of Barnstable is about three miles from the harbour of Yarmouth ;" in another, that a long point of land intervenes between " Yarmouth harbour or Bass river harbour, and Hyanis or Barnstable harbour ;" in both instances drawing an express discrimination between Yarmouth harbour, to which the vessel was bound, (taking the term to be the synonyme of port,) and Hyanis, or Barnstable harbour, in which she was seized.

Every thing proves that Bass river harbour was the original destination of the vessel. In this sense, it cannot be denied, that Bass river harbour was the port to which, in the language of the law, she was " ostensibly bound." No one contends, that when at her anchorage in Hyanis bay, where she was seized, she could be considered as arrived at Bass river harbour. It was ten miles from this harbour—a peninsula intervening—and, as the verdict finds, the vessel had gone to Hyanis bay after being compelled, by head winds, to pass Bass river.

But, it is contended, that as her clearance was not specified to Bass river harbour, but to the port of Yarmouth, an arrival at Gage's wharf would as well have satisfied the exigencies of her case ; that, in fact, she had arrived there when anchored where she was seized, and that, having then a right to demand her permit to land, and

having demanded it, the circumstances make out a termination of the voyage as effectually as if she had put in to Bass river.

We have already stated, we think, sufficient reasons for not admitting that the clearance could be satisfied by a destination to Gage's wharf. Yet, it cannot be denied, that there is one part of the special verdict that does throw some obscurity over this part of the case. It is that in which the jury find in these words : " that, in the practice of the custom horse for Barnstable, and of the owners and masters of vessels belonging to Barnstable district, Yarmouth and Barnstable are considered one and the same port; and that Gage's wharf, at the head of Lewis' bay, is a place in Yarmouth, at which vessels bound to that port frequently unload, and that no difference is made in the custom house between Yarmouth and Barnstable, or Hyanis, as to the entry of vessels that have arrived at either place."

If, in this passage of the verdict, the jury meant to find, that a vessel arriving in Hyanis roads, an open roadstead, not locked in by any head lands that could make a port of it, had, in fact, arrived at Gage's wharf, or Bass river, they should have been explicit; and, absurd and repugnant to the geography of the country, and the common sense of mankind, as the fact would have been, we must have submitted to it, or refused to act upon it. As it is, we can only draw such inferences as the finding will sanction. And we are free to confess, that we cannot understand what is meant by a practice of the custom

house and shipmasters of Barnstable, which con-
founds the open roadstead of Hyanis with the
harbour of Bass river, or even the landing place
at Gage's wharf, the one ten, the other three
miles off. We can very readily conceive why the
landing place at Gage's wharf should be indiffe-
rently called Falmouth or Barnstable, since it is
in the town by the one name, and the landing
place for the port or bay of the other name, the
line crossing the bay but a few feet from the
wharf. To arrive, therefore, at Barnstable
harbour, or Lewis' bay or Hyanis roads, which
seem to be somehow confounded in this verdict,
and to arrive at the township of Yarmouth, at
Gage's wharf, may be considered as one and the
same thing. And yet the inference from that fact
may be directly the reverse of that insisted on for
the defendant in error. For, the finding is clear
and positive, which distinguishes between Barn-
stable harbour and Yarmouth harbour; and if,
then, Barnstable harbour be identified with the
landing place as Gage's wharf, the conclusion is
unavoidable that the port of Yarmouth cannot
mean the landing place at Gage's wharf. Indeed
it is impossible to arrive at the conclusion that
the destination of this vessel was indifferently to
Gage's wharf or Bass river, without permitting a
mere inference, and that too from equivocal
terms, to conflict with a positive finding of the
jury couched in the most explicit terms. And
even when advanced that far, it would still remain
for the defendant here, to maintain that a vessel
at anchor in Hyanis road had completed her

1826.

Otis
v.
Walter.

voyage to Gage's wharf: a proposition as wide of the fact with reference to the topography of the country as it is of the intendment of law, or the finding of the jury. For the words of the special verdict are, "that the vessel when seized lay at anchor in the harbour or port of Barnstable, above half a mile from the shore or beach, and about *three miles* from the harbour of Yarmouth." That the jury did not intend to confound Gage's wharf with the harbour of Yarmouth is distinctly shown by the words that follow the above, declaring Gage's wharf to be six miles and a half from where the vessel was seized. Whether the jury were right or wrong in fixing these distances, the inference we deduce from it is still the same, to wit, that the harbour of Yarmouth and Gage's wharf could not be one, no more that the port of Barnstable and the harbour of Yarmouth The vessel lay in the former, three miles distant from the latter, and six and a half from Gage's wharf.

Upon the whole, we can discover nothing in this case to induce us to alter the opinion entertained in the two former, that the vessel had not reached the *terminus* of her voyage, that she was *in itinere*, and therefore liable to seizure. On the subject of the argument deduced from the demand of the permit to land, we think this also was fully answered and disposed of in the former decisions of this Court in the same suit. We are therefore of opinion that the act on which the collector relies, justified the seizure; that there is error in the judgment of the Court of Massachusetts; that

it must be reversed, and a judgment entered for the plaintiff here, the defendant in the original suit.

Judgment accordingly.