Clay vs. Clay.

CASE 23—PETITION EQUITY—JANUARY 27.

# Clay vs. Clay.

APPEAL FROM BOURBON CIRCUIT COURT.

A receipt, even between parties standing in no relation of trust or confidence, may be explained, varied, or contradicted by parol evidence. Less effect will be given to a receipt executed by a ward to his guardian, and especially in a case where the minority of the ward has but recently ceased, and where, for that reason, the relation will be considered as still having an undue influence on the mind of the ward.

A receipt was executed to the guardian by his ward within less than a month after the latter had attained full age, upon a final settlement with the guardian, for a specific sum, in full of all claims, dues and demands against the guardian. The ward was the nephew of the guardian, and reposed the utmost confidence in his integrity and judgment. He had resided with his mother in a distant county, and had never heard of an allowance improperly made to the guardian in a sttlement previously made with the county commissioners un*til* after his final settlement with and receipt to his guardian. *Held*—that the receipt does not have the effect of a conclusive bar to a re-examination of the accounts of the guardian.

The equitable doctrine applicable to all trustees, and especially to guardians, is, that if they use the trust fund, or mingle it with their own moneys, they are liable for the fund and interest.

A guardian whether appointed by will or under the statute, who loans the money of the ward without taking security therefor, will not be allowed to escape liability, by

merely showing that the borrower was in the possession of a considerable estate, and was reputed to be solvent, or even wealthy, at the time of the loan. The loan must be made on safe securities.

Upon a settlement with a guardian, interest should be compounded every two years, up to the arrival of the ward at full age; and, as the relation of guardian and ward then ceases, current interest only should be allowed, upon the aggregate amount then due, until paid.

ALEXANDER & HANSON, and ROBINSON, for appellant, cited 6 *Dana*, 207; 7 *B. Mon.*, 573; 1 *Story's Equity, sec.* 317; 7 *J. J. Mar.*, 239; 2 *B. Chy. Rep.*, 211; 2 *Kent*, 244; 5 *Dana*, 133; 1 *Johnson's Chy· Rep.*, 510; 5 *Dana*, 594; 6 *Ib.*, 6; 7 *B. Mon.*, 171; *Rev. Stat.*, 375, sec. 10; *Civil Code, sec.* 167; 4 *Johnson's· Chy. Rep.*, 284; 6 *B. Mon.*, 357.

G. & R. T. DAVIS, for appellee, cited 6 *J. J. Mar.*, 199; 5 *J. J. Mar.*, 35; 3 *Dana*, 376; 5 *Dana*, 153; 1 *B. Mon.*, 231; 6 *Dana*, 3; 5 *Dana*, 594; 2 *B. Mon.*, 261; 3 *Ib.*, 153; *Hill on Trustees*, 787; 7 *B. Mon.*, 554; 10 *B. Mon.*, 413; *Hill on Trustees*, 548, (374;) 6 *Dana*, 207.

JUDGE DUVALL DELIVERED THE OPINION OF THE COURT:

Sidney P. Clay died in the year 1834, leaving a will containing the following provisions :

"I appoint my wife, Isabella, personal guardian of all my children in conjunction with Brutus J. Clay, or, in case of his refusal, some other fit person to be appointed by the court, who shall manage the pecuniary affairs of their estate, and shall pay over to my wife, Isabella, according to her order, the profits of each one's estate, to be laid out by her at her discretion, for the support and education of each one respectively, and no part of each child's estate shall be paid to her or him without my wife's consent, until they arrive at the age of twenty-one, provided she remains my widow ; but should she marry again, then all the powers vested in her by this clause of my will shall cease, and the guardian of the pecuniary interest of my children shall exercise all the powers vested in her." By a subsequent clause, the testator appointed his wife, Isabella, and Brutus J. Clay executrix and executor, who were not to be required to give security.

The will was admitted to record by the Bourbon county court in September, 1834; and although both the executrix and executor qualified, it appears from the record that the chief, if not the exclusive, control and management of the estate was assumed by the latter, as executor and testamentary guardian —the widow having married prior to the year 1838. The precise date of her marriage is not shown.

Green Clay, one of the children of Sidney P. Clay, arrived at the age of twenty-one years in December, 1854, and on the 5th of January following, upon a final settlement with B. J. Clay as his guardian, executed to the latter a receipt for $6,-209, in full of all claims, dues and demands against his said guardian.

He afterwards brought this action, setting out, in his original petition, the foregoing facts, and alleging that he made the settlement with his guardian in ignorance of his rights; that the defendant, in the settlement of his accounts as executor and as guardian, with the county commissioners, made in May, 1818, had been allowed a credit for $1,500 which had been loaned to A. C. Scott in April, 1836, by the defendant, and which sum was lost by said Scott's failure to pay. The credit complained of is for $2,286 25, being the aggregate amount of the loan and interest up to the date of the settlement. It is furthermore alleged, that this money was loaned at a usurious interest of ten or twelve per cent.; that no security was taken for the debt; that the defendant took the note of Scott payable to himself in his individual right, and not as a fiduciary; that the original note was several times renewed, and each time in the same way; that the plaintiff was very young at the time of the settlement and allowance complained of, and that he had no knowledge of this improper credit until after his final settlement, and the execution of his receipt to his guardian.

In an amended petition the several settlements made by the guardian are assailed upon the ground: First. That he was charged with current interest only, on the funds in his hands, from the year 1836, up to the 1st January, 1845, instead of being charged with interest compounded every two years; and,

*Secondly.* That the allowance to the guardian for his services was exorbitant.

The defendant, in his answer, admits that in one of the numerous settlements of his accounts as *executor* and *guardian* he was allowed a credit on account of the debt due from Scott, and which he had been unable to collect. He says that he sold to Scott a lot of cattle belonging to himself, and having at the time some money in his hands as executor of S. P. Clay, he loaned $1,500 of it to Scott, and took two several notes for the two debts thus created, but does not recollect whether the note for the loaned money was executed to him as executor, "though he is inclined to believe it." That he did not require security for either debt, relying on the large property of Scott, and his high character at the time for solvency and punctuality ; that afterwards Scott paid the defendant a part of his own debt, and for the residue of it, together with the debt for the loaned money, he took Scott's note without security, payable to himself personally, and not as executor ; that "there was no usury in this last or in the previous notes ;" and that some time afterwards Scott failed in business, became insolvent, and left the country, in consequence of which the debt was lost. He also relies upon the receipt executed by the plaintiff, and denies that the latter was at the time ignorant of the facts and circumstances attending the credit which had been allowed on account of the Scott debt.

On the final hearing the court below dismissed the petition, and the plaintiff has appealed.

The questions presented by the record are :

1. What effect is to be given to the receipt relied on by the appellee ?

2. Has the appellee so discharged the duties of his trust as to render himself liable to the appellant ?

3. If so, to what extent is he liable ?

*First.* The receipt appears to have been executed by the appellant within less than a month after he had attained full age. He was the nephew of his guardian, and, as we are authorized to infer, reposed the utmost confidence in his integrity and judgment. He had resided with his mother in a distant coun-

ty, and in his answer to the interrogatories propounded by the appellee, which answer has, by law, the effect of a deposition, he says he had never heard of the transaction with Scott, or of the loss resulting from it, until after his final settlement with, and receipt to, his guardian. The truth of this statement is confirmed by the testimony of his brother.

Courts of equity will never give to a receipt executed under such circumstances the effect of a conclusive bar to a re-examination of the accounts of a trustee.

If a receipt between parties standing in no relation of trust or confidence may be explained, varied, or contradicted by parol evidence, there is an obvious reason for giving even less effect to a receipt executed by a ward to his guardian, and especially in a case where the minority of the ward has but recently ceased, and where, for that reason, the relation will be considered as still having an undue influence on the mind of the ward. This is the well settled doctrine.

It is therefore clear that the execution of the receipt in question, under the circumstances stated, constituted no obstacle to the relief sought in the action.

2. The liability of the appellee for the fifteen hundred dollars is, we think, very clearly maintainable, upon two grounds: In the first place the facts in the record present a case of the intermingling of the trust fund, by the trustee, with his own funds in the prosecution of his own business. This is evident, even on the face of the pleadings, the substance of which has been already stated. The appellee is unwilling to say positively that the original note of Scott for the $1,500 was made payable to him in his fiduciary character. "He is inclined to believe" that it was. But, however this may be, it is admitted that the note executed by Scott on the 13th September, 1839, was made payable to the appellee in his individual, and not in his fiduciary capacity, although, according to his theory, only about one-third of the amount belonged to himself in his own right. It may be furthermore remarked, in this connection, that the witness relied on by the appellee as proving that he made the loan originally as executor, states that the appellee declared at the time of the transaction that the mon-

ey belonged to the heirs of S. P. Clay, and that it would not be required until some of them became of age. Yet it does not appear that the note given in 1836 was renewed until September, 1839, and the note then given was made payable the first of January following. On the last mentioned note suit was brought by the appellee and an attachment obtained against the property of Scott. A protracted litigation followed, throughout the whole course of which no allusion is made to the fact that any other person than himself had any interest in the debt. The record affords no explanation of these facts, which certainly fail to make out an ordinary case of regular loaning by a guardian, vigilant in his office, and aware of its responsibilities.

The equitable doctrine applicable to all trustees, and especially to guardians, is, that if they use the trust fund, or mingle it with their own moneys, they are unquestionably liable for the fund and interest. (*Jenning's ex'rs vs. Davis, &c.*, 5 *Dana*, 133, and the authorities there cited.)

But if the facts touching this point, or the legal conclusions from them, were otherwise, the ground of liability which we next proceed to notice must be deemed conclusive.

(2.) It is admitted that no security of any kind whatever was taken for the sum so claimed to have been loaned. Shall a guardian be allowed to escape liability in such cases, by merely showing that the borrower was in the possession of a considerable estate, and was reputed to be solvent, or even wealthy, at the time of the loan? We are not aware that this precise question has ever been decided by this court. But the policy of the law, the interests of infants, and the safety of their estates, and the good faith and diligence required of this class of trustees, point unerringly to the proper solution. In the case of *Jenning's ex'rs vs. Davis, supra*, it is said that "the most important and delicate interests are generally committed to the hands of a trustee, as a conscientious, faithful, and prudent friend of the donor. As such he should use the powers vested in him. As a prudent, discreet, conscientious friend, he should loan out the surplus of the trust fund, *on safe securities*, or otherwise vest it so as to best promote the

benevolent ends of the trust." The same is especially true of the relation of guardian and ward, and of the interests committed to the former, whether appointed by will, or under the statute. He is in an eminent degree the *friend* of his ward, the safety of whose estate depends upon the fidelity and vigilance of the former.

So regardful has the legislature always been of the interests of the ward, that since the passage of the act of 1795 the court appointing a guardian has been made personally liable for any loss to the estate of the ward resulting from the taking of insufficient security. The Revised Statutes contain a substantial re-enactment of this provision. It would be strangely inconsistent with the public policy, thus forcibly indicated, to allow the guardian to invest the money of his ward in permanent loans, without taking security of any kind. In the case of *Smith, &c. vs. Smith,* 7 J. J. Mar., 238, it was decided that the guardian should be held responsible for $1,600 of his ward's money which had been, in good faith, invested by the guardian, in the purchase of sixteen shares of Kentucky bank stock, then at par. It is there said that anciently guardians were held responsible for the sufficiency of all *personal* security which they ventured to take for the estate of their wards, but were not responsible if they loaned the trust fund on *real* security, deemed good at the time of the loan, or vested in the *public funds.*

It is conceded that this doctrine has never prevailed here, but it certainly has never been modified to the extent contended for. If, as properly held in the case cited, the loss should fall on the guardian because "he did not guard the interests of his wards with as much vigilance and circumspection as sound policy, as well as authority, wisely exacts from those to whom the estates of infants may be confided," should not the guardian, in the present case, be held responsible for the same reason. Has he displayed a higher degree of vigilance and circumspection in making the investment under consideration?

The wisdom of the rule which requires that guardians should never be allowed to invest the money of their wards upon the credit of a single individual, without some good security,

is illustrated by the facts of this case. Scott was the owner of a considerable property, and was reputed to be solvent and punctual in his dealings. He was, however, a large dealer in cattle, and was a borrower of money in the prosecution of that business, and suddenly, and to the surprise of his friends, he failed, and was proceeded against by a number of creditors, including the appellee, as an absconding and fraudulent debtor.

3. The appellant was entitled to recover one-fourth of the fifteen hundred dollars, with current interest thereon from the date of the original loan to the 13th September, 1839, and from the latter date the interest should be compounded every two years up to the arrival of the appellant at full age, and as the relation of guardian and ward then ceased, current interest only should be allowed upon the aggregate amount then due, until paid.

In no other respect will the settlement be disturbed. Although the allowance to the guardian is large, we are not prepared to say, in view of all the facts, that it is unreasonable.

For the error and to the extent indicated, the judgment is reversed, and the cause remanded for a judgment and further proceedings in conformity with this opinion.