CASE 19—PETITION EQUITY—APRIL 13.

# Tanner, &c. v. Skinner, &c.

APPEAL FROM CLARK CIRCUIT COURT.

1. PERSONALTY ADVANCED TO THE WIFE VESTED IN THE HUSBAND.—
TRUSTS—GUARDIAN'S SURETY.—A wife having died leaving two children, her husband intermarried with her sister, who also died leaving three children. The father of the two sisters advanced to each, at her marriage, property valued at $1,200. After the death of both their father executed a writing purporting to give the same property to their children, "to be kept sacred to their benefit by the court appointing a proper guardian," who should give him a receipt. The father of the children at the same time gave him a receipt for the $2,400, reciting that he held it as guardian for the benefit of said children. But he was not then their statutory guardian, nor until six years afterward, when on his appointment he reported to the court that he had in his hands $2,400 due to his children. Other funds came into his hands as their guardian, and in his final settlement he failed to account for the $2,400.

   *Held*, 1, The property advanced to the daughters, being slaves and personalty, vested in the husband, the personalty absolutely, and a life estate in the slaves; the remainder in the slaves descended to the children on the death of their mothers. There was then no consideration for the undertaking of the husband to his father-in-law to hold the amount for the benefit of the children.

   2. *But the husband clearly intended to waive his marital rights* and secure to his children the value of the property given to their mothers. Though the receipt may not have evidenced a complete trust, his subsequent conversion of the property, his qualification as guardian, the reports then made, and his ability to make such pro-

vision, created a complete trust which could have been enforced. *The sureties on his bond as guardian are therefore liable,* but would not be if he had been insolvent at the time of his qualification.

2. A TRUST IMPERFECTLY CREATED WILL BE ENFORCED, if there be a valuable consideration, and though the instruments do not pass the title to the property, if from the documents the court can clearly perceive the terms and conditions of the trust and the parties to be benefited.

    In such cases effect is given to the consideration to carry out the intention of the parties, though informally expressed.

3. But if from imperfect declaration a trust is not fully created, and the beneficiaries are compelled to come into court to have the trust perfected, the court will refuse relief where the plaintiff claims as a volunteer.

4. If by a clear and explicit declaration, duly executed and intended to be final and binding, one makes himself a trustee, the trust will be enforced. (Perry on Trusts, 96; Hill on Trustees, 86.)

5. THE PETITION MUST SPECIFY THE PARTICULAR ITEMS OBJECTED TO in a suit in equity surcharging a guardian's settlement made with the county court. (Wooldridge v. Watkins, 3 Bibb, 352.)

6. IT IS THE NATURAL AND LEGAL DUTY OF A FATHER TO SUPPORT HIS CHILDREN, and it is only under peculiar circumstances that he will be allowed to charge them for maintenance or education.

7. COMPOUND INTEREST SHOULD CEASE on the ward's arriving at full age, and simple interest only should thereafter be charged against the guardian. (Clay v. Clay, 3 Met. 554.)

BRECKINRIDGE & BUCKNER, . . . . . For Appellants,

CITED

MS. Opinion, January, 1872, Gorham v. Betts.
Perry on Trusts, secs. 95, 96, 97, 98.
MS. Opinion, Winter Term 1874, Burbridge v. Varnon.
1 Blackstone (Sharswood's), p. 449.
7 Mon. 170, Chaplin v. Moore.        2 Kent, 171.
5 Rawle, 323, Harland's Acc'ts.
2 Bland, 606, Addison v. Bowie.
1 Baily, ch. 274, Dupont v. Johnson.
3 Green (N. J.) 303, Tompkins v. Tompkins.
4 Bibb, 187, McIntire v. Hughes.
1 Ch'y Appeal, 28, Jones v. Lock.
8 Ired. 252, Huntly v. Huntly.
3 S. & G. 315, Aivey v. Hall.
7 Barr, 175.                15 Simons, 99.

2 Duvall, 274, Bush v. Bush.
7 J. J. M. 239, Smith v. Smith.
41 Barb. 558, Cornwall v. Benjamin.
16 Beavan, 315, Bridge v. Bridge.
18 Beavan, 292, Beech v. Keep.

THOMAS TURNER, . . }
HUSTON & BECKNER, }    · · · · · · · · · For Appellees;

CITED

General Statutes, sec. 15, chap. 43.
Perry on Trusts, sec. 95.
3 B. Mon. 161, Patton v. Patton.
7 Mon. 167, Chapline v. Moore.
2 Story's Equity, 572, 577.
3 Mon. 351, Caldwell v. Harlan.
4 Mon. 373, Peddicord v. Hill.
3 Metc. 548, Clay v. Clay.
14 B. Mon. 419, Alsop v. Barbee.

JUDGE COFER DELIVERED THE OPINION OF THE COURT.

Archelaus Tanner married Serilda Ramsey, daughter of James Ramsey, September 30, 1847, and she died September 15, 1850, leaving two children, Willis and Lucien, surviving. November 11, 1851, Tanner married Eliza, also a daughter of the said James Ramsey, and she died October 21, 1854, leaving three children, Eliza, Frances, and Kate.

Shortly after the marriage of his daughters Ramsey gave them a negro and other property, amounting to the sum of $1,200 each. February 12, 1856, he executed the following writing:

"This is to show the valuation of the property herein specified which has been given by me to my daughter Serilda and her heirs, valued by me as follows, to wit:

| Specification. | | | | Valuation. |
|---|---|---|---|---|
| One negro girl and child, . | · | | · | 700 00 |
| Houshold furniture, | · | · | · | 100 00 |
| One cash note, | · | · | · | 75 00 |
| One cash note, | · | · | · | 325 00 |
| | | | | $1,200 00 |

"The whole amount of $1,200 is now given by me to the heirs of Serilda Tanner, who at her death left two children, namely, Lucien and Willis, to be equally kept sacred to their benefit by the court appointing a proper guardian to that effect, and the guardian to receipt to me for that amount above named."

On the same day he executed a similar writing in regard to property given to his daughter Eliza, and at the same time and as part of the same transaction Tanner signed and delivered to Ramsey the following receipt:

"Received from James Ramsey the sum of twenty-four hundred dollars, it being a benefit for the heirs of Serilda and Eliza M. Tanner, now deceased, which I hold as guardian for their benefit mutually."

Tanner was not then statutory guardian for his children, though it seems that Ramsey expected him soon to qualify as such. He not having qualified as soon as Ramsey seems to have expected, was informed that the old gentleman was displeased by his delay, and August 12, 1862, he caused himself to be appointed guardian for all his children, and gave bond as such, with Scott and the appellee, I. C. Skinner, as his sureties; and on the same day made to the Clarke County Court, by which he had been appointed, his reports as guardian, in which he recited that James Ramsey had given to each of his daughters, the former wives of the said Tanner, property valued at $1,200, and that he had been appointed guardian of his children, and had in his hands the sum of $1,200 due to Willis and Lucien and a like sum to Eliza, Frances, and Kate. These reports were sworn to and recorded, as required by law.

Scott, who was one of his sureties, having died, Tanner appeared in the county court November 22, 1869, and entered into a new bond reciting that he had been previously appointed guardian for his children, and covenanting "that he would

faithfully discharge the trust of guardian." On this bond the appellee I. C. Skinner and Samuel W. Ramsey, the intestate of the appellee Cyrus Alley, became sureties.

In 1863 James Ramsey died, and in 1864 the sum of $4,200 was paid by his executors to Tanner as guardian for the children of his deceased wives, and in 1870 he made a settlement of his accounts as guardian with the county court. In that settlement he failed to account for the amount mentioned in his receipt to Ramsey and in his reports of August 12, 1862.

In 1872 the wards of Tanner brought this suit in the Clark Circuit Court against him and his sureties in the bond of 1869, seeking to surcharge the settlement made in 1870, and to have the guardian charged with the sum of $2,400 and interest thereon, and praying for a settlement of his accounts and for judgments for the balance found to be due them. The failure to account for this sum is the only error complained of in the petition.

The sureties answered and denied that Tanner had ever received one cent of said sum of $2,400. They alleged that he was not guardian at the time he executed the receipt, and denied that he ever received or held said sum or any part of it as guardian. They also alleged that Tanner made settlements of his accounts as guardian between 1862 and 1869, in which he was not charged with said sum; and they insisted that they could not be charged, under the bond sued upon, for any sums received by him prior to his appointment as guardian in 1862, or with any sum with which he had not been charged in the settlements which preceded the date of the bond of 1869. They further averred that the receipt of February 12, 1856, was without consideration, and that Tanner was not chargeable as guardian with any part of the sum for which the receipt was given. They also alleged that Tanner had supported his wards; that he was a poor man, worth less than any one of his

children, and should be paid for rearing them; and they prayed that compensation for their support and education might be credited on whatever sum was found to be in the guardian's hands.

The cause having been referred to the master, he made an alternative report showing the amount due to each ward, including in the account the sum of $2,400 mentioned in the receipt, and the amount due to each if it was excluded. The court adjudged that the sureties were not liable for the amount named in the receipt, and the plaintiffs have appealed.

1. It is insisted for the appellees that there was no consideration for the undertaking on the part of Tanner to hold the money for the benefit of his children, and that the obligation is for that reason not enforceable against him or his sureties.

2. That not being guardian at the time he executed the receipt, the sum which he thereby undertook to hold for his children never came to his hands as guardian, and they are therefore not liable.

1. It is contended for the appellants that inasmuch as the three papers were executed at the same time, all relate to the same subject-matter, and each is fragmentary in itself, they should be construed as one writing, and that when so construed they show (1) that the property was given by James Ramsey to his daughters for life, with remainder to their children, and (2) that Tanner retained the property and converted it to his own use, and in consideration thereof agreed to hold its estimated value for his children.

2. They also contend that if it shall be held that there was no consideration for the promise to hold the money as guardian for their benefit, the writings of February 12, 1856, and the reports made by Tanner August 12, 1862, when he was appointed guardian, evidence a complete declaration of a trust which is enforceable against him and his sureties.

We do not regard the writings as showing that the gift by

Ramsey to his daughters was limited to them for life, with remainder to their children. The word "heirs" is a word of limitation and not of purchase, and there is nothing in the evidence to show that it was used in any other than its ordinary sense. The donor had made similar advancements to his other children, but no instance appears in which he imposed any such limitation.

The property other than the slaves, when given to Tanner's wives, vested in him absolutely, and the slaves having been given to them after the passage of the act of 1846, further to protect the rights of married women, the title vested in the wives subject to the marital rights of the husband, and the title to the slave given to each one vested at her death in her children subject to the life-estate of Tanner.

At the time of the execution of the writings signed by Ramsey and the receipt given by Tanner the slaves had not been sold. As the property other than the slaves had vested in the husband and became absolutely his, its conversion could not furnish a valid consideration for his undertaking to hold its value for his children.

The writings gave him no right to dispose of the slaves; the title to them was in his children subject to his life-estate; and as all right to them had passed from Ramsey by the gift to his daughters, he could not divest their children of the title which had descended to them from their respective mothers; so that it is clear Tanner took no interest whatever in the slaves which could serve as a consideration for the undertaking contained in his receipt. Nor can their subsequent illegal sale by him relate back to the execution of the writings and furnish a consideration to uphold them. Their sale was a nullity so far as the children are concerned; and although they may now ratify the conversion and hold their father liable for their value, this can not supply the want of a valid consideration existing at the time the writings were executed. We

are therefore of the opinion that the sureties of Tanner can not be charged upon the ground that his undertaking to hold the sum mentioned in the receipts for the benefit of his children was founded upon a valuable consideration.

We are then to consider whether the receipt and the reports made by Tanner to the county court, after he had qualified as guardian, created an enforceable trust.

Perry, in his work on Trusts, sec. 95, says: "The authorities establish this proposition, that where there is a valuable consideration the court will enforce the trust, though it is not perfectly created, and though the instruments do not pass the title to the property, if from the documents the court can clearly perceive the terms and conditions of the trust and the parties to be benefited. In such cases effect is given to the *consideration* to carry out the intentions of the parties, though informally expressed."

But if from the imperfect declaration a trust is not fully created, and the beneficiaries are compelled to come into court to have the trust perfected, the court will refuse relief where the plaintiff claims as a volunteer.

But while the court will not perfect and then enforce a voluntary trust, "yet if the settlor, by a clear and explicit declaration, duly executed, and intended to be final and binding upon him, makes himself a trustee, courts of equity will enforce the trust." (Perry on Trusts, sec. 96; Hill on Trustees, side page 86.)

The doctrine announced by these authors is fully sustained by the adjudged cases, and seems to us to be supported by reason and justice.

At the time Tanner executed the receipt he was abundantly able to waive his marital rights in the property given to his deceased wives and to settle it upon his children. While there was no legal obligation upon him to do so, what he did was in itself right, and was no doubt done because he felt that it

was but just that the bounty intended for the mothers should be secured to their children. The formal manner in which the writings were executed leaves no doubt but that it was intended by both parties to secure the value of the property to the children. No complaint is made that the execution of the receipt and its delivery to James Ramsey were procured by undue importunity on the part of any one, or that advantage was taken of the situation of Tanner to induce him to do what he was not entirely willing to do.

That he intended to hold the fund for his children is not only evidenced by the writing and the circumstances attending it, but by the subsequent sale of the slaves in which they had the remainder after his life-estate; and the conversion of the money to his own use can only be reconciled with an honest purpose on his part by supposing that such intention still continued. After the sale of one of the slaves Tanner qualified as guardian, and on the same day made formal sworn reports that he held the sum of $1,200 for the children of each of his wives, in which, after reciting the gift of the property and that he had qualified as guardian, he "reports that he has in his hands due his wards the sum of twelve hundred dollars" for each set of children, "he having heretofore converted the personal estate of said children into cash."

The children then had no other estate; and as he was their natural guardian, and there was therefore no other necessity for the appointment of a statutory guardian, it is impossible to doubt that his purpose had been, from 1856 to 1862, to waive his marital rights in favor of his children, and to secure to them the value of the property given to their mothers by their grandfather.

Even though the receipt given in 1856 may not have evidenced a complete trust, there can, we think, be no doubt but the subsequent conversion of the property, his qualification as guardian, and the reports then made, coupled with his ability

to make such provision for his children out of property given to their mothers, created a complete trust which could then have been enforced against Tanner.

If the facts bound him, they will also bind his sureties. The receipt stipulated that he would hold the fund as guardian, and he could have had no other reason for qualifying except to comply with that undertaking; and when he had qualified he redeemed fully his whole obligation by declaring, under oath, and putting it upon the public records, that he held it as guardian.

If, after this, Tanner had been removed, and another had been appointed guardian, there can be no doubt but he could have been compelled to account for the fund. As he remained guardian, it was his duty to secure it; and his sureties bound themselves that he would faithfully discharge his duties, and they must respond for the loss resulting from the failure of their principal to do what they covenanted he would do.

If it appeared that at the time of his qualification Tanner was insolvent, the rule would no doubt be different. An insolvent father could not thus provide for his children at the expense of his sureties. But he was, then able to secure the amount, and if he had done his duty as guardian he would have done so; and those who undertook that he would faithfully perform his trust must answer for his failure.

In the settlement of his accounts with the county court the guardian obtained credits as against four of the appellants for money paid out for their tuition, and perhaps for some articles of clothing furnished some of them; and the same credits having been allowed by the judgment of the court below, they now complain of that also as error, and, claiming that greater allowances should have been made, the sureties prosecute a cross-appeal.

The appellants did not complain in their petition of these credits as improper; and not having done so, no question could

Vol. XI.—10

be raised by exceptions merely as to their legality. (Wooldridge v. Watkins, 3 Bibb, 350.)

It is the natural and legal duty of a father to support his children, and it is only under peculiar circumstances that he will be allowed to charge them for maintenance and education. The children of Tanner had no estate at the time he qualified except the $2,400 mentioned in the receipt, and he was not charged with interest on that sum except from the date of his qualification, and only with simple interest after that time.

His sons were able from that time forward to earn their own support, and there is no doubt that the labor they and their two sisters, who resided with their father, performed was worth as much as the support of all.

The interest on the money received by the guardian from Ramsey's executors was compounded after some of the wards reached their majority, and no commission was allowed him on the $2,400 and its interest.

The compounding of interest should cease as to each at the time he or she arrived at full age. (Clay v. Clay, 3 Met. 554.)

The guardian should be allowed five per cent commission on the sum of $4,398.70, charged on account of the principal and interest of the $2,400.

For the errors mentioned the judgment is reversed on both the original and cross-appeal, and the cause is remanded for a judgment in conformity to this opinion.