## VERNETTA P. YOUNG, ET AL., v. J. J. NESBITT, ET AL.

**Husband and Wife—Wife's Property.**

Where a woman took a vested remainder in property at the death of her father and afterwards married, such interest vested in her husband upon her marriage.

**Wife's Property.**

Where the wife's property is invested in lands but conveyed to the husband, he is liable to her as between themselves, but this will not prevent creditors from subjecting such land to the payment of his debts and the wife's rights are postponed to those of his creditors.

APPEAL FROM BATH CIRCUIT COURT.

September 8, 1876.

OPINION BY JUDGE COFER:

The appellees, having obtained judgments in the Bath circuit

court against the appellant, Sinnett Young, caused executions of fi. fa. to issue thereon, which were levied upon a tract of 114 acres of land situated in that county, as the property of said Young. The sheriff advertised that he would sell the land on October 12, 1874. On that day Young and his wife instituted this suit in the Bath circuit court against the appellees, in which Mrs. Young asserted title to the land and sought to have it settled upon and conveyed to her.

The facts upon which she bases her claim to the relief sought are these. She is the daughter of John Arnold, who died testate at his domicile in Mason County, Ky., in 1829. By his will he gave all his estate, except some small legacies, to his wife until his youngest child should arrive at the age of twenty-one years, which would be in 1849, and then to be disposed of according to the law of descents and distribution. Among other property left by the testator was a female slave named Peggy, who gave birth to two children, one in 1845, and the other in 1847. Mrs. Young was married to her present husband July 19, 1845, and in 1851 the estate of her father was divided between his children, and the two children of Peggy were allotted to Mrs. Young, and soon thereafter came into the possession of her and her husband, where they remained and were regarded and spoken of by both the husband and wife as belonging to the latter. One of the slaves was sold in the latter part of 1859 for $1,450 and the other in January, 1860, for $1,250. The sale of one seems to have been negotiated by Mrs. Young, and of the other by her husband, acting at her request and for her. The price of both seems to have been kept by Mrs. Young under her personal control, or in the hands of her step-father and former guardian.

Before the sale of the last of the two slaves, Mrs. Young made an agreement with her brother, John D. Arnold, to buy from him the tract of land now in contest, provided she could sell the slave; and on the day after the sale, which was early in January, 1860, the agreement was concluded and Mrs. Young and her husband took possession of the land and have resided on it ever since. The slaves did not sell for enough to pay for the land, but the residue was paid out of money received from the estate of Mrs. Young's father, and the whole was paid by her in person or by her step-father, in whose hands she had placed a part of the proceeds of the sale of the slaves. No bond or other written memorial of the contract was entered into at the date or the purchase, but the evidence shows that it was understood between Mrs. Young and Arnold that the title was to be made to her; and it may be inferred from the circumstances disclosed by

the record, that the husband acquiesced in that arrangement, but his express assent is not proved.

In March, 1860, Arnold, in the absence of Mrs. Young and her husband, and without the knowledge of either, executed, acknowledged, and caused to be recorded, a deed conveying the land to Mr. Young. But before the execution of the deed, to wit, January 26, 1860, he executed and delivered to Mrs. Young, who has held it ever since, the following writing, viz.:

"An article of agreement between Sinnett Young, of the county of Bath, and state of Kentucky, on the first part, Vernetta P. Young, his wife, on the second part, it is agreed that for and in consideration of her interest in the property in the city of Maysville, and the sale of her slaves, Charles and Mimma, she is to have the farm that was bought of John Arnold, in her name, for her use and benefit. This 27th of January, 1860.          SINNETT YOUNG."

In a very short time after the execution of the deed, Mrs. Young read it and became aware that the land had been conveyed to her husband. She immediately consulted her step-father and former guardian, who assured her that she could always prove that she paid the purchase money, and that she would be able to successfully assert her claim to the land at any time, and advised her to let the matter rest, and she did so. She always spoke of and claimed the land as her own, and often did so in the presence of her husband, who never disputed her claim, but repeatedly spoke of the land as belonging to her; but the evidence fails to show that she ever spoke to him of the deed having been made to him, or that he ever expressly agreed that it should be made to her, or admitted that it was improperly made to him. It does not appear that the appellees had any notice of Mrs. Young's claim until this suit was commenced.

Upon this state of fact the circuit court adjudged the land subject to the husband's debts, and this appeal is prosecuted from that judgment. The first position assumed by Mrs. Young's counsel is that the land was purchased by her, with the assent of her husband, and paid for with her money, and that the deed was made to her husband by mistake, and therefore he holds the land in trust for her; while it is contended by counsel for the appellees that the two slaves and the money received from John Arnold's estate belonged to the husband, and consequently, that there cannot, under any circumstances, be a resulting trust in favor of Mrs. Young.

We think it entirely clear that the slaves and the money used in paying for the land belonged to Mr. Young. The testator gave his estate to his wife until his youngest child attained majority, and then directed that it should be divided and distributed according to the law of descent and distribution. Whether the property be treated as passing under the will or as passing under the statute, subject to the particular estate given to the testator's widow by the will, the result will be the same so far as the rights of Mrs. Young are concerned. In either case she took a vested remainder at the death of her father. Title either by descent or by purchase vested in her then, the period of enjoyment alone was postponed. She and her coheirs or codevisees took a joint estate in remainder in the woman Peggy, and the children of Peggy born during the continuance of the particular estate belonged to the remaindermen precisely as the mother did. *Murphy v. Riggs,* 1 Marsh. 532. And although one of the children was not born until after the passage of the act of 1846 for the better protection of the rights of married women, yet the title to Peggy having vested at the death of the testator, the title to her subsequent offsprings vested at the same time. And if this were not so, the interest of Mrs. Young in Peggy vested in Mrs. Young's husband upon her marriage in 1845, and the interest in the after-born children, which, but for the marriage would have vested in Mrs. Young, vested by operation of law in her husband. In any view of the case, then, the two children of Peggy were the property of Mr. Young from the time of the division of the testator's estate in 1851, unless counsel are right in construing the Act of 1846, as relating to the time of acquiring possession of slaves, and not to the time of the vesting of the title.

That statute provided that "the slave or slaves of a married woman shall hereafter, within this commonwealth, be held and taken to be real estate, in so far that no slave or slaves, or the increase thereof, which any such married woman may have at the time of her marriage, or which shall come, descend, or be devised or given to her during her coverture, shall be liable for the debts of her husband." The slaves both came to the possession of Mrs. Young and her husband after the passage of the act, and after the marriage, and it is contended that this was a coming to her within the meaning of the act so as to bring them within its operation. It is obvious that the phrase "which shall come," etc., did not have reference to either possession or the right of possession, but to the vesting of title.

But if the language of the act was such as to admit of the construc-

tion contended for, that construction would not be adopted if the language would admit of any other. Under the law as it stood at the time of Mrs. Young's marriage, all her interest in the slaves of her father, and their increase, vested eo instanti in her husband, and as is well suggested by counsel for the appellees, could not be divested by legislative action. We must, therefore, hold that the slaves were the property of the husband, and so far as the claim of Mrs. Young depends upon the assumption that the land was paid for with her money, it must fail. *Jackson v. Sublett,* 10 B. Mon. 467.

Counsel next insist, and upon that proposition they mainly rely, that the writing of January 26, 1860, and the facts and circumstances disclosed in the record, amount to a waiver of the husband's marital rights, and constitute a valid post-nuptial agreement. A husband may certainly waive his marital right to money or property coming to him through his wife and permit her to retain it as her own; and if he does so she may hold it against him and volunteers under him. *Bryant's Admr. v. Bryant,* 3 Bush 155.

But where the wife, to relieve the pecuniary embarrassment of her husband, united with him in the sale of her land and slaves, and in consideration that she did so he executed to her his notes for the amount realized from the sales, it was held that, while the notes were enforcible in equity against the administrator of the husband, they created only an equity which could not be enforced to the prejudice of creditors of the husband having legal demands, and she was postponed until the other creditors were paid. *Mariman v. Mariman,* 4 Met. 84.

If, therefore, it be conceded that Mr. Young waived his right to the slaves, and to the money arising from their sale, and consented that it might be invested in land to be conveyed to her, it is clear on the authority of *Mariman v. Mariman,* that until that agreement was executed it was invalid as to the husband's creditors, even if the agreement of the husband had been supported by a sufficient consideration.

The agreement, if one was made, that the land should be conveyed to Mrs. Young was never executed, and was without any valuable consideration whatever. Upon what principle, then, can it be enforced by her to the prejudice of the appellees? Her counsel argue that she has an equity dating back to the time of purchasing the land, and that the appellees have only an equity dating from the time of making their levies, and that as her equity is the elder, it must prevail; and they cite *Lowe & Whitney v. Blinco,* 10 Bush 331;

*Morton v. Robards,* 4 Dana 258; *Halley v. Oldham,* 5 B. Mon. 233; and *Righter v. Forrester,* 1 Bush 278, as sustaining that position.

Those cases all involved the question whether an equity in land levied on under execution would prevail over the title acquired by a purchaser under the exectuion who had notice of the prior equity, and it was held in such that it would. But in all those cases the prior equity was supported by a valid legal consideration, while the equity asserted by Mrs. Young is without such consideration; and in view of what was decided in Mrs. Mariman's case, it may well be doubted whether, even if there had been a valuable consideration for the alleged waiver of Mr. Young's marital rights, the equity thereby created in Mrs. Young's favor could be enforced against his creditors.

In consideration that Mrs. Mariman would sell her land and slaves, her husband expressly agreed to repay to her the amount that should be realized from such sale, and pursuant to that agreement executed to her his notes for the amount; but the court said her petition showed that she placed the proceeds of her property in his hands to relieve him from pecuniary embarrassment, expecting to be paid by him when his circumstances should become better. "The natural tendency of her conduct was to give him credit with others who knew nothing of the arrangement between him and her." The court further said: "As she has come into equity for relief, sound policy seems to forbid that her claim, which has no legal validity, shall be placed upon an equal footing with the legal demands of creditors. A different doctrine might open the door to many frauds." And her claim was postponed to all other creditors.

The foregoing remarks of the court in that case apply with peculiar force to the facts in this case. Mrs. Young became acquainted with the fact that the deed had been made to her husband within a few days after its date, but failed to take any steps to have it corrected. The deed was a matter of public record and all persons ignorant of the facts as she claims them to have been, had a right to regard the land as belonging to her husband. "The natural tendency of her conduct was to give him credit with others who knew nothing of the agreement between him and her." And to hold that she may now enforce that secret voluntary agreement against these appellees who were ignorant of the agreement when they trusted him, and who may, and probably did, trust him on the faith of the land in contest, not only might but would open the door to many frauds.

The evidence shows that at the time of the execution of the writing

of January 26, 1860, Mr. Young was free from debt, and was the owner of an estate, besides that devised from his wife's father, worth about $8,000; and counsel seek to sustain Mrs. Young's claim on the ground that the writing and other evidence in the record show a valid post-nuptial settlement, and that Mr. Young holds the title in trust for her, and that trust ought now to be enforced.

There is no doubt but his circumstances were such that he might have made a valid post-nuptial settlement upon her, but he did not do so. The writing upon its face evidences a trust, but is merely executory, and as we have already remarked was executed without any valuable consideration, and cannot be enforced.

The well settled rule upon that subject seems to be that "Where there is a valuable consideration the court will enforce the trust, though it is not perfectly created, and though the instrument does not pass the title to the property, if from the documents the court can clearly perceive the terms and conditions of the trust, and the parties to be benefited. In such cases effect is given to the consideration to carry out the intention of the parties, though informally expressed. But if from an imperfect declaration the trust is not fully created, and the beneficiaries are compelled to come into court to have it perfected, the court will refuse relief where the plaintiff claims as a volunteer." Perry on Trusts, Sec. 95; *Tanner, et al., v. Skinner, et al.,* 11 Bush 120.

In order to sustain this position, that there was a valid post-nuptial settlement, counsel cite *Duhme & Co. v. Young, et al.,* 3 Bush 343; *Hinde's Lessee v. Longworth,* 11 Wheaton 198; *Babcock v. Eckler, et al.,* 24 N. Y. 623; and *Townsend v. Maynard,* 45 Pa. St. 198.

The settlements involved in those cases were executed, and were called in question by the husband's creditors, who, finding the wife invested with title, were forced to go into equity for relief; while in this case the creditors of the husband were pursuing their legal remedies against him, in whom they found the legal title, and the wife seeks to interpose to perfect an unexecuted settlement and then to have it enforced, and thereby to overreach and defeat creditors who are not under the necessity of coming into equity at all.

It is only when creditors of the husband are compelled to come into equity for relief that mere equities of the wife to property held in his name can be successfully set up against them. The cases of *Miller and Wife v. Edwards, et al.,* 7 Bush 394; *Ward v. Crotty, et al.,* 4 Met. 59; and *Forepaugh, Bishop, et al., v. Appold & Sons,* 17 B. Mon. 625, were all cases in which creditors invoked the chancel-

lor's aid to subject to the payment of their debts that which in equity belonged to the wife.   If the title to the land in contest was so situated that creditors were forced to seek aid in equity to subject it, the rules applicable to that state of case would be wholly different from those applicable to the facts as presented in this case.   Then the court would withhold its aid until an equitable settlement was made on Mrs. Young.   *Sims v. Spalding,* 2 Duv. 121.

Counsel also cite and rely upon *Whitehead v. Whitehead, et al.,* 64 N. Car. 538.   The land in contest in that case was paid for with money which was the separate estate of the wife, and by mistake was conveyed to the husband, whose creditors levied upon and sold it, and the purchasers were held to be trustees for the wife, whether they had notice of her equity or not.   Without approving or disapproving the decision in that case, we may remark that it is wholly unlike this.   There the land was paid for with money which was the separate estate of the wife; here the land was paid for with the money of the husband.

We are for these reasons of the opinion that the appellants failed to manifest an enforcible right in Mrs. Young, and that her petition should have been dismissed.   The court, however, without any appropriate pleading to that end, adjudged the whole land to be sold, first to pay to Mr. Young $1,000 in lieu of a homestead, and then to pay the several judgments in favor of the appellees, and retained the case in order to dispose of any surplus that might remain.

The appellees sought no judgment for a sale of the land, unless the court should adjudge it to Mrs. Young, in which event they prayed for a sale of so much as would equal the value of the permanent and lasting improvements put upon it by Sinnett Young; and if they had done so, there was no authority for a judgment to sell the whole unless it should be necessary to do so to raise the amount due, and $1,000 for the homestead; and even then it was error to sell the homestead, although the buildings and the ground occupied by them were worth more than $1,000, unless it was necessary to sell it in order to satisfy the judgments.   We are, for these reasons, of the opinion that the appellants failed to manifest in Mrs. Young an enforcible right to the land, and that her petition was properly dismissed.

But the court erred in adjudging the land to be sold to satisfy the appellee's judgments.   They did not ask for a judgment to sell the land unless the court should adjudge the land to Mrs. Young, and then they only asked for a sale of so much as would pay the value of

47

the lasting and valuable improvements put upon it by Sinnett Young. As the land was adjudged not to be the property of Mrs. Young, both the petition and counterclaim should have been dismissed.

The judgment for a sale of the land is *reversed,* and the cause is remanded with directions to set that judgment aside and to dismiss the appellees' counterclaim.

*H. L. Stone, Holt & Brooks, for appellants.*

*A. Duvall, V. B. Young, J. S. Hunt, Nesbitt & Gudgell, for appellees.*