BIBB *vs.* M'KINLEY, HOPKINS, AND THE HEIRS OF HENRY
CHAMBERS, DEC'D.

1. A father devised and bequeathed to his children, (being a
daughter and two sons, then infants of tender years,) a large
real and personal estate, to be equally divided between them.
The share of the daughter was to be assigned her, *if she de-sired it,* when she married or attained her majority. The
daughter *married,* and died about three months *thereafter,*
neither herself or husband having, during the coverture, asked
or desired a division of the estate; but the executors still con-tinued to hold the same under the will. On a bill filed by the
husband, to obtain the wife's interest in her father's estate, it
was held that he was not entitled to recover; because the
wife's share had not been reduced into possession during her
life.

2. One who takes possession of the property of an infant, without
the authority of law, may be treated as a guardian; but one
who lawfully holds as an executor, cannot be treated as a
guardian against his consent.

3. The plaintiff also sought to recover by his bill, a female slave
and her children, alleged to have been given to his wife by her
grandfather, and delivered to the testator, as her father and
guardian by nature; which slaves came to the possession of,
and were still retained by the executors. Held, that from the
plaintiff's own showing, his remedy was complete at law, if
he was entitled to the slaves, and equity would not relieve him.

Error to the Court of Chancery at Huntsville.

Bill and answers heard before Chancellor *Peck.*

The plaintiff filed his bill on the equity side of the
Circuit court of Madison, which, upon the establishment
of the separate courts of Chancery, was transferred to
the Chancery court holden at Huntsville.

In the bill, it is stated that Henry Chambers, late of

the county Limestone, Alabama, departed this life, in the year of our Lord one thousand eight hundred and twenty-five, having first made and published his last will and testament—a copy of which is exhibited with the bill— That the will was admitted to probate in the Orphan's court of Limestone, on the sixth day of March, eighteen hundred and twenty-six, and the defendants, McKinley and Hopkins, duly qualified as executors thereof, and have ever since continued to act as such.

The bill further states, that the executors were also appointed by the testator, testamentary guardians of his children, and up to that time, continued to act in the two-fold capacity of executors and guardians. No other guardians have been appointed; and although McKinley and Hopkins gave no bond, as such, inasmuch as the estate was directed by the *will*, to be kept together until the testator's daughter married, or attained the age of twenty-one years, upon the happening of either of which events, her portion was to be assigned her, if she desired it; yet they have superintended the education of the testator's children, and defrayed their expenses out of the estate left by him.

The testator left three children, of very tender years— viz., Mary S., a daughter, and Robert S. and Henry, sons —the two latter of whom are still under the age of twenty-one. By the will, it was directed that the estate should be equally divided between these children—the respective shares of Robert S. and Henry to be assigned them on attaining their majority; and the executors were authorised to vest such money as the testator should die possessed of, or as might thereafter be raised from

his estate, above what was necessary to the education and support of his children, in such manner as he might think most useful to them.

It is charged by the bill, that the testator's estate consisted of a cotton plantation, and about fifty-five negroes, together with farming utensils, household and kitchen furniture—a large quantity of cotton in market—bonds and notes to a large amount, and cash,—in proof of which, the plaintiff refers to the inventory returned by the executors. It is further charged, that the negroes have increased greatly in numbers, and that the income from the estate has greatly exceeded the expences incident to the education and maintenance of the children. Further—the executors, under the power supposed to be vested in them, have purchased a large quantity of land, thus converting personal property to a large amount into real estate : some of these purchases were made prior to the marriage of Mary S. Chambers, and some subsequently.

The plaintiff alleges that Mary S. owned, at the death of her father, in her own right, a negro woman named Rhoda, about twenty-two years old, and her child, Alice, about one year old—which negroes are returned in the inventory, as belonging to Mary S., having been given to her by her grandfather—that these negroes have increased in number, and that the defendants, McKinley and Hopkins, have had them in their possession, as the undisputed property of Mary S., since the sixth day of March, eighteen hundred and twenty-six, up to the filing of the bill in this case.

The plaintiff charges, that on the twenty-fifth day of

February, eighteen hundred and thirty-five, he intermar-
ried with Mary S. Chambers, with the consent and ap-
probation of McKinley and Hopkins, as her guardians—
that they lived together as husband and wife, until the
twenty-eighth day of May, of that year, when she de-
parted this life. The plaintiff did not, nor did his wife
request a division of the testator's estate after their mar-
riage, but the same continued as theretofore, in the pos-
session of the executors, under their appointment as such,
and as guardians under the will.

The bill concludes, by praying the usual process
against the defendants, that they may answer, &c.—that
Rhoda, and her child Alice, together with her increase,
be delivered over by the executors to the plaintiff, with
a reasonable hire for their services—and further, that
one-third part of the testator's estate be allotted him, and
that a pecuniary equivalent be decreed him, for one-third
part of all the monies which have been vested in lands
—that if the relief asked for, be denied him, the plaintiff
then asks such relief as may be proper, &c.

The view taken of the case, in the opinion of this
court, does not make it necessary to make a detailed ab-
stract of the answers : only so much, then, as is deemed
material, will be noticed. The defendants, McKinley
and Hopkins, admit the death of Henry Chambers—that
he made a *will*, appointing them executors—that they
qualified as such, and returned an inventory of their tes-
tator's estate, as stated in the plaintiff's bill. They also
admit, that they were appointed testamentary guardians
of the children of the testator, and have directed their
education, and defrayed the expences of their mainte-

nance; yet, they explicitly aver, that they never took upon themselves the guardianship, by qualifying as the law provides; but on the contrary thereof, upon consultation between themselves, shortly after the death of their testator, they determined not to take upon themselves that trust, under the impression, that the powers conferred by the will, would enable them, as executors, to discharge the duties pertaining to the office of guardian.

The defendant, McKinley, states that four of the negroes (naming them) mentioned in the inventory, have died, and that the surviving slaves, and their increase, including Rhoda and her children, now number eighty-seven.

The defendants, McKinley and Hopkins, admit that they have purchased with the monies belonging to the estate of their testator, a considerable quantity of real estate, both before and since the intermarriage of the plaintiff and Mary S. Chambers, which they insist they were authorised to do by the *will.* In regard to the woman Rhoda, and her children, they say that they cannot admit that they belonged to the wife of the plaintiff. It is true, in the inventory, they say that Rhoda, and Alice, then her only child, belonged to Mary S., " *as we are informed.*" This information was not derived from their testator, but from some one after his death; and in stating it in the inventory, they did not intend to decide the question of property between the heirs. They admit the intermarriage of the plaintiff and Mary S., and the death of the latter, as stated in the bill—but they insist that neither the plaintiff nor Mary S., during the life of the wife, ever intimated a wish that her portion of the testator's estate should be set apart to her.

Bibb *vs.* M'Kinley et al.

The defendant, Hopkins, in his answer according to the statute, claims the benefit of a demurrer to the plaintiff's bill.

The heirs of the testator answer through A. F. Hopkins, their guardian *ad litem*, in usual form, calling upon the plaintiff to make good their case by proof, and claiming all advantage that might have been gained by a demurrer. The deposition of Samuel Vaughan, taken at the instance of the plaintiff, was read at the hearing. The witness states, that in the year eighteen hundred and eighteen, or the first of eighteen hundred and nineteen, he brought from Virginia, the negro woman Rhoda, then aged about five or six years. She was sent to Mary S. Chambers, as a present from her grandfather. Rhoda has two children—Alice, about twelve years old, and Wilson, about seven. The average annual hire of the woman, with her children, since H. Chambers' death, would be about twenty-five dollars.

At the hearing, the chancellor dismissed the bill *pro forma*, and rendered a *decree* against the plaintiff for costs; from which decree, the plaintiff has prosecuted a writ of error to this court.

*J. A. Campbell & McClung*, for plaintiff in error.
*Hopkins*, contra.

COLLIER, C. J.—In *real* estate, the husband gains a title only to the rents and profits during coverture, but the estate itself remains entire to the wife, after the death of her husband, or to her heirs, if she dies before him; unless by the birth of a child, he becomes tenant for life

9 P                    81

by the curtesy. But in chattel interests, the sole and absolute property vests in the husband, to be disposed of at his pleasure, if he chooses to take possession of them; for unless he reduces them into possession, no property vests in him, but they shall remain to the wife, or to her representatives, after the coverture is determined.

A chattel real, vests in the husband *sub modo;* as, in the case of a lease for years, the husband shall receive all the rents and profits of it, and may, if he pleases, sell or dispose of it during the coverture: it is liable to execution for his debts: and if he survives his wife, it is, to all intents and purposes, his own. Yet, if he has made no disposition thereof in her lifetime, and dies before his wife, he cannot dispose of it by will: for the husband having made no alteration in the property during his life, it never was transferred from the wife. Such is also the law in regard to chattels personal, or choses in action: as debts upon bond, contracts, and the like; these the husband may have, if he reduces them into possession, by receiving them, or recovering them at law. And upon such receipt, they are absolutely and entirely his own; and shall go to his executors or administrators, or as he shall bequeath them by will, instead of re-vesting in the wife. But if he dies before he has recovered or reduced them into possession, so that at his death they still continue *choses in action,* they shall survive to the wife. In both these species of property, the rule is the same, in case the wife survives the husband: but in case the husband survives the wife, it is very different at common law, with respect to chattels real, and choses in action; for he shall have the chattel real, by survivorship, but not the chose in action.

In respect to chattels personal, or choses in possession, which the wife hath in her own right, as ready money, &c. the husband acquires an immediate and absolute property therein by the marriage, not only potentially, but in fact, which never can again re-vest in the wife, or her representatives—(2 Bla. Com. 433, 434, 435.) Such is the law, as laid down by the learned commentator upon the *English Law;* and it was affirmed by this court in Johnson adm'r vs. Wren, 3 Stew. Rep. 172; Mayfield vs. Clifton, ibid. 375; and in Hogan vs. Bell and wife, 4 Stew. & Por. R. 310,—so far as it relates to the *personal chattels* of the wife *in action.*

In Mayfield vs. Clifton, the plaintiff filed his petition in the Orphan's court, in which he represented that Thomas Murphy died in eighteen hundred and fifteen, possessed of negroes and other personal property: that his estate was free of debt; that he left his widow, Frances J., and two infant children; Nancy, of whom the petitioner was guardian—and John, of whom Clifton was guardian—that the widow was appointed administratrix of the estate by the Orphan's court, in which the petition was filed, and shortly afterwards intermarried with Clifton, and died in eighteen hundred and twenty-seven. Whereupon, the plaintiff prayed that the estate might be distributed according to law. The facts stated in the petition were admitted—and further, it was agreed that the property in question was in the possession of Frances J., from the death of Thomas Murphy, "till her second marriage, and from that event, in the possession of herself and the said Clifton, till her death, which occurred at the time mentioned in the petition; and that no dis-

tribution of said property was ever made between the said Frances, in her lifetime, and the children of Murphy." The Orphan's court was of opinion, that Clifton was entitled to the distributive share of his deceased wife, although there had been no distribution made in the lifetime of the wife; but this court reversed its decree, considering it necessary to entitle Clifton to his wife's distributive share of her estate, that his *possession* should have been *quasi* husband, whereas the facts showed that his possession was only as administrator in right of his wife. That the law was correctly stated, we think will not admit of serious controversy—(Wallace et ux. vs. Taliaferro et ux. 2 Call's R. 447; Schuyler vs. Hoyle, 5 Johns. Ch. R. 196; 2 Kent's Com. 115, 116; Baker vs. Hall, 12 Vesey's R. 497; Mitford vs. Mitford, 9 Vesey's R. 95, 96; Carr vs. Taylor, 10 Vesey's R. 579; Wildman vs. Wildman, 9 Vesey's R. 177; Nash vs. Nash, 2 Mad. R. 139; Toller's Ex'rs, 220, 221; Clancy's Rights of Women, 2; Sturgineger vs. Hannah et al. 2 Nott & McC. R. 147.)

Property may be said to be in possession, where a man hath both the right, and also the occupation of the thing —it is in action, where a man hath not *the* possession, but merely a right to possess the thing. In the latter case, the thing is said to be rather in *potentia* than *in esse;* though the owner may have as absolute a property in, and be as well entitled to, such things in action, as to things in possession—(2 Bla. Com. 396, 397.)

Having stated these principles, by which the marital rights of the husband are to be determined, we proceed to consider the nature of the interest which the plaintiff

acquired by marriage, in the wife's undivided portion of her father's estate. To the real estate of the wife, we do not understand that the plaintiff asserts any title, but he seeks an equivalent in money, to the extent of one-third the value of the realty belonging to the testator's estate, which the executors have purchased. He further demands an equal interest with his wife's surviving brothers in the personal estate in possession, and in the debts due, *&c.* The *will* clearly shows, that the executors possessed the entire confidence of the testator, and confers a large discretion upon them ; yet, as the view we take of the case, does not require an exposition of the will in this particular, we decline to notice further the legality of the powers they have exercised. We will, however, examine the plaintiff's pretensions, upon the *hypothesis* that the investment of money in land was unauthorised, and that for the purpose of distribution, it must still be regarded as money.

We have already seen, that if the share of the plaintiff's wife, in her father's estate, was regarded as *in action*— that not having received or recovered it, he has no right to possess it now. Clancy, in his Rights of Married Women, 109, in enumerating *choses in action*, mentions " debts by obligation, contract, or otherwise, for rent, money lent, money had and received, or for the price of work and labor, &c. &c. ; also legacies, shares of intestate's estates, money in the funds, or any other claim to personal property, which has not been reduced into possession." To the same effect, is Johnson, adm'r, vs. Wren, 3 Stew. R. 175, and Hood vs. Archer et al. 2 Nott & McC. R. 149. The interest of the plaintiff's wife, was

a right to an undivided third of her father's estate, in the hands of his executors, and according to the authorities cited, was *in action* only.

It has, however, been argued for the plaintiff, that the wife's interest was not a mere right to the distribution of property in the hands of the executors of her deceased father; but the defendants, McKinley and Hopkins, having been appointed by the will, guardian's of the testator's children, and having, in effect, performed the duties pertaining to that office, should be held to account as such, and the possession be taken to have been in that character.

In Magee vs. Toland, (8 Porter's R. 36,) it was decided, that the possession of the guardian, is the possession of the ward; and the ward having married, the possession was *eo instanti*, transferred to the husband, and the property should be regarded as in his possession, as much as if there had been an actual manucaption. In that case, there was but one slave in controversy, and no one claimed an interest in that slave but the wife of Toland, so long as she lived,

In the case at bar, both the executors explicitly deny that they ever accepted the guardianship of the heirs of their testator, as provided by law in the case of testamentary guardians—(Aik. Dig. sec. 10, 11, p. 221, 222.) They admit that they have discharged the duties of guardians of all the children, and that some of the receipts given them for disbursements about their maintenance, describe them as guardians, but they considered it very immaterial, as they designedly omitted to take upon themselves, any other trust than that of executors, and

the receipts referred to, have been allowed in the settle-
ment of their accounts, as executors. True, there are
instances in which persons taking possession of the es-
tates of infants, have been held to account as guardians;
though they may never have received any judicial ap-
pointment.

Thus, in Lloyd and wife vs. The Ex'rx of ·Cannon et
al. (2 Dess. Rep. 232,) it appears that Cannon, the testa-
tor, (a connection of Mrs. Lloyd,) on the death of her fa-
ther, took charge of her person and property, and took
out such authority as was then to be obtained from the
British Board of Police, which was the only semblance
of civil authority in Charleston, then held by the enemy
as a garrison town. After the restoration of the Ameri-
can government, Cannon, without taking out letters of
administration, continued to manage the affairs of his
young relation, who lived in his family. A question
was made, whether Cannon should not be regarded as a
wrong-doer, and so not entitled to commission. The
court considered that he should rather be commended
than censured, for getting possession of the estate as he
did, though he should afterwards have applied for letters
of administration ; yet he was regarded as a trustee, and
as such, equitably entitled to his commissions.

So, if a man intrudes upon an infant, he shall receive
the profits but as guardian, and the infant shall have an
account against him in chancery, as guardian ; for equi-
ty will consider him as a trustee. If, however, the in-
fant so elect, he may treat the intruder as a trespasser—
(Newburgh vs. Bickerstaff, 1 Vern. R. 295 ; Morgan vs.
Morgan, 1 Atk. R. 488 ; Mellish vs. Mellish, 1 Sim. & Stu.
R. 138; 2 Fonb. Eq. 235, 236.)

The cases cited are unlike the present. In Lloyd and wife vs. The Ex'rx of Cannon et al. the acts of Cannon were conservative, and considered as justified by the condition of the country at the time—clearly manifesting an intention not to benefit himself alone, but to protect the interest of his young relation. Had he been regarded in equity as a wrong-doer, his services, though meritorious, would have been uncompensated.

The cases cited from Vernon, &c. only prove that an infant may charge one who tortiously possesses himself of his property, either as his guardian or a wrong-doer. This right of election results from the fact, that the possession is unauthorised, and it may be more beneficial to the infant, to treat the trespasser as a guardian, than in his true character.

But in the case at bar, the defendants, McKinley and Hopkins, had a right to the possession of the estate left by their testator, under the express terms of the *will*. And though they might have accepted the guardianship of the heirs, and as such, have directed their education; yet it might well be questioned, that considering *the character of the trusts imposed upon them by the will, whether they should not, as executors, have retained the possession of the property.* Be this as it may, in point of law, they never were guardians. As executors, they might, and actually did possess and retain the estate committed to their charge, together with its increase; and we cannot now say that they assumed another office, and assign to it their possession.

It is not pretended, that any distribution of the property in the hands of the executors, was at any time du-

ring the life of the plaintiff's wife, made or desired.  And even supposing that the testator may have left lands which vested in his heirs, yet as we have no statute similar to that of the 32 Hen. VIII, c. 37, which gives to the husband arrears of rent due to the wife before her coverture, in case of her death, the plaintiff cannot recover any thing for rent—(See Ognel's case, 4 Co. R. 51.) Nor have we any statute like the 29 Car. II, c. 3, which enacts, that the husband shall have administration of all his wife's personal estate, which he did not reduce into his possession during her life, and retain the same to his own use.  From a view of all which, it will follow, that the plaintiff can claim nothing under the will of his wife's father.

In respect to the woman Rhoda, and children, which are said to have been given to the wife of the plaintiff by her grandfather, it is argued for the defendants, that these cannot be recovered ; or if recoverable, not by suit in equity—That the possession of the executors was adverse to an immediate and exclusive possession in the wife, and not as bailees for her ; or if not adverse, their remedy was complete at law.  If the first objection is well taken, it is clear, that the possession did not vest in the wife, by operation of law, and consequently, nothing passed to the husband by virtue of the marriage.  We will, however, waive the decision of this question, since it is clear, that if the plaintiff had such a possession of these slaves, as gave him the title, his legal remedy is adequate, and of consequence, chancery cannot afford him redress.

The hire of Rhoda and her children, must be regarded

9 P                    82

as a chose in action, and cannot be recovered; unless it be as an incident to a suit in which the slaves themselves are recovered.

The result of our opinion is, that the decree of the chancellor is correct, and it is therefore affirmed, with costs.