# Whetstone, *per pro ami*, v. Whetstone's Ex'rs.

*Bill in Equity for Settlement of Trust.*

1. *Person non compos mentis; right to sue by next friend.*—A person *non compos mentis* may sue by next friend, before and without an inquisition of lunacy; but a mere volunteer who institutes a suit as next friend of a *con compos*, before there has been an inquisition of lunacy, always proceeds at his peril; peril, that the alleged *non compos* may not in fact be so, or may recover and repudiate his interference; or that the chancery court may not consider him a suitable person, and may disallow his intermeddling.

2. *Same; statute 17 Edward 2.*—The statute of 17 Edward 2, Ch. 10 and 19, conferring on the king, as *parens patrix*, power to take care of the property of lunatics and idiots, though enacted before the settle-

[Whetstone, per pro ami, v. Whetstone's Ex'rs.]

ment, or even the discovery, of this country, being inconsistent with our institutions and form of government, is not of force with us.

3. *Same; equity of bill in equity by next friend; how determined.*—The equity of a bill filed by a *non compos mentis*, suing by a next friend, before and without an inquisition of lunacy, must be determined on its averments, independent of the state of the complainant's mind, and as if she were of sane mind, suing by herself, and in her own right.

4. *Same; jurisdiction of court of equity to enforce settlement by agent or trustee.*—Where a brother voluntarily assumed the relation of agent and trustee for his sister, a *non compos mentis*, without an inquisition of lunacy, and continued in the management of her estate, receiving the rents, income and profits, and paying her personal expenses, a court of equity, upon his death, will entertain a bill against his executor, in favor of the sister, she suing by next friend, to compel a settlement of the trust.

5. *Same; control of court over next friend.*—When a bill is filed by a next friend for a *non compos mentis*, who has not been so adjudged, the welfare and interest of the *non compos*, being matters of prime, dominating importance, should receive the careful consideration of the court, before the litigation is allowed to progress. These preliminary inquiries should be first instituted, and, to this end, the chancellor may require the verdict of a jury, or a report from the register, so as to properly inform his conscience; and if the suit is successful, its proceeds should not be allowed to pass into unsafe hands.

6. *Same.*—Should there be a successful inquisition, and a guardian should be appointed, pending the litigation, an inquiry should be instituted whether such appointment is in the interest of the *non compos*; and if this inquiry prove satisfactory, such guardian should be allowed to control the litigation.

7. *Continuing trust; when time does not run against.*—When there is a continuing trust, with active duties required of, and performed by the trustee, the case is analogous to a running, mutual account, and time does not run against it; but each act done under, or in recognition of the trust, is a renewal of the obligation it imposes.

APPEAL from Autauga Chancery Court.

Heard before Hon. N. S. GRAHAM.

The case made by the bill in this cause, and the relief sought thereby are sufficiently stated in the opinion. The defendants demurred to the bill, assigning the following, among other grounds of demurrer: (1) That the complainant had a full and adequate remedy at law. (2) That it is not averred that Rachel D. Whetstone has ever been declared to be a person of unsound mind, and incapable of attending to her own affairs. (3) That no facts are set forth in the bill authorizing Henry L. Stone and Daniel H. DeBardeleben to file the bill in this cause in the name of the said Rachel D. Whetstone. (4) "That it is not shown that the said complainant, Rachel D. Whetstone, has commenced this suit, but that the said Henry L. Stone and Daniel H. De Bardeleben, of their own motion, and without the consent of the said Rachel, have filed this bill." (5) That the bill does not show that the said Lewis M. Whetstone ever became the trustee of the said Rachel. (6) That the facts and circumstances alleged in the bill show that simply the

relation of principal and agent existed between the said Rachel
D. and the said Lewis M. Whetstone; and that no facts are
averred, showing any complication of the accounts between
them, or other cause, making it necessary to resort to a court
of equity for a settlement of the same. (7) That it appears
from the bill, that the complainant's claim is barred by the
statute of limitations. (8) That it appears from the bill, that
said claim is a stale demand, and is barred by the lapse of time.

On a submission of the cause on demurrer, the chancellor
was of the opinion that the complainant's claim was a stale de-
mand, and he caused a decree to be entered sustaining the demur-
rer on that ground; and that decree is here assigned as error.

GUNTER & BLAKEY, for appellants.

THOS. W. SADLER and WATTS & SON, contra.

STONE, J.—The present bill was filed June 14th, 1882, by
Rachel D. Whetstone, suing by her next friends, Henry L.
Stone and Daniel H. De Bardeleben, against the executors of
Lewis M. Whetstone. It avers that the said Rachel D. "has
been all her life a person of weak mind and understanding, and
has never undertaken to transact any business affairs, or to
manage property; and since the year 1860, has been entirely
incapable of making or understanding any business transactions,
from mental derangement." The bill further alleges that the
said Rachel D. and the late Lewis M. Whetstone are daughter
and son of Henry Whetstone, who died about the year 1835,
leaving a will, of which Lewis M. was executor, and acted as
such. That the said Lewis M. settled up the estate of his
father about the year 1843, and the said Rachel D., a legatee
under said will, acquired thereunder money and other personal
property, the amount of which is charged in the bill. The bill
further charges that about the year 1844, Daniel J. Whet-
stone, a brother of Rachel and Lewis, died, and that said Ra-
chel, as distributee, thereby became the owner of other
personalty of specified value. The bill then avers that com-
plainant's "condition, on the death of her father, and on the
settlement of his estate, was fully known and recognized by all
her family, and in consequence thereof her said brother, Lewis
M. Whetstone, assumed, with her consent, to receive, hold and
manage her estate and property for her, as her agent and trus-
tee, and, in that capacity, received and held all her share of her
father's estate," and also her share of her deceased brother's
estate. The bill then charges, "that the said Lewis M. Whet-
stone never denied his trusteeship, and, up to the year 1878,
when he lost his own mind, continuously admitted that he was
32

such trustee of complainant, and held himself out to the world as her agent and trustee ; and continued to act as oratrix's agent and trustee, and to hold oratrix's estate, and to receive the interest and accumulations therefrom, and as such trustee to disburse small sums, as needed for her use, until the said Lewis M. Whetstone lost his own mind, about the year 1878. . . . . That from the death of her father to about the year 1870, oratrix lived in the family of one of her sisters, and her annual expenditures of money did not, in every thing, exceed the sum of seventy-five or one hundred dollars ; and since that time her expenditures have not been more than one hundred to one hundred and fifty dollars per annum ; and that the income of her estate has been greatly more than that. That she has never received, nor has any one for her received any part of her estate from her said trustee, L. M. Whetstone, from the death of her father to this date, except the small sums annually expended for her support, herein above mentioned." The bill shows that the said Rachel D. has never been declared a lunatic, or *non compos mentis*, by any judicial proceeding ; and, as a necessary consequence, no guardian was, or could have been appointed for her.—Code of 1876, §§ 2753, 2757, *et seq.* The prayer of the bill is,—to bring the executors of Lewis M. Whetstone to a settlement of the alleged trust, on which it is charged there is a large sum—thirty thousand dollars—due and unpaid. The defendants demurred to the bill, assigning several grounds. Such of them as present questions deemed by us to be important, we will proceed to consider, without reference to their numbers, or the order in which they are presented.

Were the persons who appear as next friends, authorized to institute this suit, and could they sue in equity ?

The statute 17 Edward the second, enacted more than five centuries ago, in chapters 10 and 19, conferred on the king, as *parens patriæ*, power to take care of the property of lunatics and idiots ; as to the former, as a mere trust ; as to the latter, as a trust coupled with an interest. It was said, however, in *Beverley's case*, 4 Rep. 126, that this statute was simply declaratory of the common law. Speaking of this power and its exercise, Lord Chancellor Redesdale, *In the Matter of Fitzgerald, a Lunatic*, 2 Sch. & Lef. 432, said : " The duty thus thrown on the crown was often difficult ; it was to be performed by the crown, according to the advice upon which the king might constitutionally act, and it has therefore long been the practice, from time to time, to authorize by the king's sign manual the person holding the great seal to exercise the discretion of the crown in providing for the care and custody of persons and estates of lunatics, which has usually been done

by grants to committees.  But I apprehend that though the discretion of the crown has thus been delegated to the person holding the great seal, yet the superintendence of the conduct of the committee, in the management both of the property and the person, originates in the authority of the court itself, as the court from which the commission inquiring of the lunacy issues, and into which the inquisition is returned, and which makes the grant founded on the inquisition.  .  .  But as the king is bound in conscience to execute the trust reposed in him by the statute, and can not do it otherwise than by bailiff, the chancellor, or person holding the great seal, is the proper authority to direct and control the authority of the person so appointed bailiff."

In *Jones v. Lloyd*, 18 Equity Cases, 265, the Master of the Rolls, after declaring the rights of the lunatic in the case, said : " That, then, being his right, can it be exercised ? That is, can a suit be instituted by the lunatic, not found so by inquisition, by his next friend ?  I have no doubt it can.  There is authority upon the subject, and it seems to me so distinct that I have no occasion to refer to the reason ; for I think the cases of *Light v. Light*, 25 Beav. 248, and *Beall v. Smith*, Law Rep. 9 Chan. App. Ca. 85, are such authorities."  The M. R., however, gives the reasons, and very forcible ones.  After stating them, he adds : " I take it, these propositions, when stated, really furnish a complete answer to the suggestion that he can not maintain such a suit.  Of course, they do not answer the question as to how far he may carry it ; but that he can maintain such a suit for protection,  .  .  I should think there can be no doubt whatever."  And in *Beall v. Smith*, 9 Chan. App. Ca. 85, it was said that " every person so constituting himself officiously the guardian, committee and protector of a person of unsound mind does so entirely at his own risk, and he must be prepared to vindicate the necessity and propriety of his proceedings, if they are called in question, and to bear the consequences of any unnecessary and improper proceedings.  He takes the risk, moreover, of having his proceedings wholly repudiated by the lunatic, if he should recover his reason, just as the next friend of an infant runs the risk of having his proceedings wholly repudiated, on the infant attaining his full age."  We do not doubt that, under limitations hereafter stated, a person *non compos mentis* may sue by next friend, before and without inquisition of lunacy.

The English statute 17 Edward II does not, of itself, constitute idiots and lunatics wards of the chancery court, as infants are.  Nor does the king's sign manual constitute them such.  Such process is issued to the keeper of the great seal, and not to the court of chancery.  It constitutes him (the

chancellor) representative of the king, to execute the trust, which the statute casts on the crown. It is a personal confidence reposed in the Lord Chancellor, the keeper of the great seal, and not in the court of chancery. The custody of the persons and estates of *non compotes mentis* is not, without more, even in England, any part of the jurisdiction of the chancery court.—*Beall v. Smith*, 9 Chan. App. Ca. 85 ; *Jones v. Lloyd*, 18 L. R. Eq. Ca. 265. In the case last cited, it was said : "The court can only exercise such equitable jurisdiction as it could under the same circumstances have exercised at the suit of the person himself, if of sound mind." The statute 17 Edward II being older than the settlement, or even discovery of this country, it would be part of our common law, if adapted to our institutions. But it is not so adapted. The constitution and frame of our government forbid that we should give it force here. The question of the equity of this bill must, then, be determined on its averments, independently of the state of complainant's mind ; in other words, as if she were of sane mind, suing by herself, and in her own right.

In *Fitzgerald's case*, 2 Sch. & Lef. 432, Lord Redesdale employed this language : "I apprehend that though the discretion of the crown has thus been delegated to the person holding the great seal, yet the superintendence of the conduct of the committee in the management both of the property and the person, originates in the authority of the court itself." *Vincent v. Rogers*, 30 Ala. 471, presented the case of a deposit of money in the hands of the latter, for the benefit of an infant, "to be kept for her use and benefit," with a stipulation by the depositary that he was to furnish her with clothing, schooling and other expenses which he might think necessary. There was suit at law on this contract, in favor of the beneficiary, alleging its non-payment to her. Defendant demurred to the complaint, and the circuit court sustained the demurrer. This court reversed the ruling, holding that the complaint made a *prima facie* case of indebtedness, which would maintain an action of *assumpsit*. It was added : "The nature and objects of the trust show, that the parties did not contemplate a present debt, or present right of action. The expenditures for Miss Vincent, which the contract confided to the discretion of Mr. Rogers, if he incurred any, were continuing in their character, and show that the parties intended to create, and did create a continuing trust. The duties of this trust, like those of a guardianship, would terminate with the minority of the beneficiary ; and hence, we fix the maturity of this demand at the time when Miss Vincent attained to lawful age. This agreement, and proof that Miss Vincent had reached the years of maturity before she sued, and that she had demanded the money of defendant, made out a

*prima fiacie* case for recovery. . . . If met as above indicated [that is, if Rogers expended moneys for Miss Vincent, under the discretion allowed him], the jurisdiction of the law court would have been ousted, and the defendant left to her remedy in chancery." In *Thornton v. Thornton*, 31 Gratt. 212, it was said : "In an agency, where there is a fiduciary relation between the parties, a court of equity has jurisdiction to settle and adjust the accounts between them." In *Moody v. Bibb*, 50 Ala. 245, this court said : "A person who assumes to act as the guardian of a lunatic without authority, or under an appointment of the probate court which is void for want of jurisdiction, may be charged as a trustee *in invitum*, and compelled to account in the chancery court."—*Corbitt v. Carroll*, *Ib.* 315 ; *Tanner v. Skinner*, 11 Bush (Ky.), 120 ; *Cole v. Cole*, 28 Gratt. 365 ; 3 Pom. Eq. § 1313 ; 2 Sto. Eq. Jur. § 1365c; *Bibb v. McKinley*, 9 Porter, 636.

According to the averments of the present bill, Lewis M. Whetstone assumed and continued the control and management of his sister's estate—she being a person of weak and imbecile mind—from the time she acquired it, until he himself became a *non compos*. During all this time, it is averred he acted in open recognition of his agency, and continually paid her necessary expenses of living. These offices are so nearly akin to those of a guardian duly appointed, that the jurisdiction of the chancery court to bring his executors to a settlement can not be questioned.

We have said that the right of a mere volunteer to institute a suit as next friend of a non-adjudged *non compos*, rests under limitations. He always proceeds at his peril ; peril, that the alleged *non compos*, or lunatic, or person of weak and incapable mind, may not in fact be so, or may recover, and repudiate the interference ; peril, that the chancery court may not consider him a suitable person, and may disallow his intermeddling. The welfare and interest of the alleged *non compos* are matters of prime, dominating importance, and should receive the careful consideration of the court, before the litigation is allowed to progress. These preliminary inquiries should be first instituted ; and to this end the chancellor may require the verdict of a jury, or a report from the register, so as to properly inform his conscience. Nor should the proceeds of the suit, if successful, be allowed to pass into unsafe hands. Should there be a successful inquisition, and a guardian appointed pending the litigation, an inquiry should be instituted whether such appointment is in the interest of the *non compos*. If this inquiry prove satisfactory, then such guardian should be allowed to control the litigation. We will not now anticipate other emergencies that may arise.

What we have said above is conclusive to show, that neither lapse of time nor the statute of limitations affects the questions raised by this bill. When there is a continuing trust, with active duties required of, and performed by the trustee, the case is analogous to a running, mutual account, and time does not run. Each act done under, or in recognition of the trust, is a renewal of the obligation it imposes.—Perry on Trusts, § 863, and note 1.

In one respect the present bill is scarcely sufficient. It should be averred as fact, and not left as an implication, that Lewis M. Whetstone paid, and continued to pay complainant's accruing, annual expenses.

Reversed and remanded.