Willie **CONNELL**, Plaintiff,

v.

**UNITED STATES STEEL CORPORATION**, a corporation, et al.,
Defendants.

Civ. A. No. 72–1118.

United States District Court,
N. D. Alabama, S. D.
Jan. 24, 1974.

George C. Longshore, Cooper, Mitch & Crawford, Birmingham, Ala., for plaintiff.

Robert G. Tate and William C. Knight, Jr., Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

Having heard the testimony of witnesses for the plaintiff and for the defendants, and on the basis of the pleadings, the stipulations and the exhibits of the parties, the Court enters the following findings of fact and conclusions of law:

### I. Findings of Fact

1. The plaintiff, Willie Connell, is a former section foreman employed at the Wylam, Alabama, mine of Tennessee Coal & Iron Company.

The plaintiff brought this action for declaratory and injunctive relief on behalf of himself and as representative of a class composed of approximately 25 Wylam foremen whose seniority was terminated on April 23, 1945, by reason of having engaged in a strike against the company.

The Court finds that the members of the class are so numerous that joinder of all members is impracticable, that there are questions of law or fact common to the class, the claim of the representative of the class is typical of the claims of the class, and that the named plaintiff will fairly and adequately protect the interests of the class.

The Court further finds that the defendants' action in terminating Mr. Connell's seniority has general application to the members of the class whose seniority was terminated at the same time and for the same reason.

The Court finds that pursuant to Rule 23(c)(2) individual notice was given or attempted to be given to all class members. The notice, among other things, directed that the class member should return a postcard in the event that member desired to be excluded from the class. The Court finds that the following individuals exercised their option to exclude themselves from this action: A. E. Bridges, J. H. Hilton, and A. D. Hooper. Also, Mrs. Rufus Jones attempts to exclude Rufus Jones, who died on September 24, 1969, from this action.

2. The Court has diversity jurisdiction, 28 U.S.C.A. § 1332. The plaintiff is a citizen of the state of Alabama. The defendants are corporations having their principal place of business in Pittsburgh, Pennsylvania.

3. The defendant, United States Steel Corporation (U.S. Steel), is the successor to the Tennessee Coal and Iron Company (T.C.I.). The defendant, Carnegie Pension Fund (the "Trustee"), is a nonprofit Pennsylvania corporation which acts as the trustee of funds used for the payment of disability and retirement pensions to eligible employees of U.S. Steel. U.S. Steel and the Trustee have contracted under seal to provide for the accumulation and administration of these funds.

4. The Court finds that while there may be issues with respect to the eligibility or entitlement of individual members of the class, there are certain other issues of general application. Issues common to the class are: (1) Can the Trustee legally give effect to the severance of seniority which T.C.I. imposed when the Wylam foremen struck; (2) Is the Alabama Statute of Limitations a defense to the action itself; (3) Is the Statute of Limitations a defense as to past accrued installments of disability or retirement pensions?

The Court has bifurcated the trial to the extent that all issues with respect to the eligibility or entitlement of individual class members are to be held in abeyance pending resolution of the three aforementioned issues.

5. The Tennessee Coal & Iron Company employed the plaintiff and other class members at its Wylam mine in the capacity of foremen. Using Mr. Connell as an example, he was first employed by T.C.I. on June 1, 1928. His employment record shows that he was continuously employed in various jobs from 1928 until he was promoted to Section Foreman on July 1, 1940. His record further shows that he remained employed as a section foreman until August 16, 1954, when it was said that he was "dropped from roll—reduction in force." His record also shows that on April 13, 1945, he "quit without notice." A notation also appears dated April 23, 1945, wherein it is said that he was "re-employed as a new employee on his former rate." The Court finds that similar entries were made on the personnel records of all class members.

6. Beginning in 1943, the testimony and company files and records show that a movement arose to organize categories of T.C.I. foremen into a labor organization affiliated with the Foreman's Association of America. Demands were made on T.C.I. to deal with the F.A.A. as the bargaining representative. A petition was filed with the National Labor Relations Board, seeking the certification of the F.A.A. as the bargaining representative of certain categories of T.C.I. foremen. By April 1945 approximately 75–80 per cent of the Wylam foremen were members of the F.A.A.

7. On April 1, 1945, the United Mine Workers of America, the collective bargaining representative of the hourly-paid mine employees, called a general strike resulting in the shutdown of coal mining production throughout the country. All of the T.C.I. mines, including Wylam, were shut down. Acting pursuant to the War Labor Disputes Act, the President of the United States seized the mines on April 12, 1945. Executive Order 9536.

8. The U.M.W. strike continued until April 23, 1945. The Wylam foremen continued to work at various tasks assigned them in the mines from the be-

ginning of the U.M.W. strike until April 12 and 13, when many Wylam foremen, including all of the class members, went on strike to demand recognition of their union as the bargaining representative and to protest their working conditions.

9. During the period April 13 through April 23, the foremen continued to report to the mine at their regular shift starting time. For the first few days they attempted to speak to higher management in an attempt to gain recognition of their union as their bargaining representative. Thereafter no attempt was made, but testimony and contemporaneous company records show that the foremen continued to report to the mine at the start of their regular shift throughout the entire period of the strike. Management persisted in its refusal to discuss grievances with the foremen except on an individual basis.

10. On April 12, 1945, a letter was prepared by Robert Gregg, president of T.C.I., advising the Wylam foremen that "you are hereby informed that in the event you do not return to your regular assignment by Monday, April 16, 1945, you will be considered to have resigned without notice." Although the plaintiff denies he received such a letter, based upon the testimony of the witnesses it appears that all of the foremen either received the letter or were knowledgeable of its contents. Based upon existing documents, it appears that all of the members of the class had a notation placed in their personnel file to the effect that they "quit without notice." On the other hand, it is undisputed, and the Court so finds, that no hourly-paid employee at the Wylam mine lost his seniority by reason of the strike.

11. The U.M.W. strike ended April 23, 1945. The foremen's strike ended at the same time. No loss of coal production occurred as a result of the foremen's strike. The mine was ready for operation when the miners reported for work. T.C.I. hired all of the foremen on their same jobs and at the same rate of pay they held before the strike, but forfeited all their previously accumulated seniority.

12. The named plaintiff remained in the employ of T.C.I. until August 14, 1954, at which time his personnel record shows that he was laid off in a reduction of force. In accordance with company policy, his continuous service was broken two years later. Although Mr. Connell was for all practical purposes employed by T.C.I. for 26–28 years, he was ruled not eligible to receive a pension, either disability or retirement, because he did not accumulate 15 post-1945 years. Some of the other class members lost time for pension purposes and thereby received a smaller pension by reason of the severance of their seniority in 1945.

13. The Trustee's eligibility rules are as follows:

(a) Any Employe who, at the time of his retirement from employment subsequent to February 28, 1950, shall have had at least fifteen (15) years continuous service and shall have attained the age of 65 years, shall be entitled to receive a pension upon his retirement.

(b) Any Employe who shall have had at least fifteen (15) years continuous service and who shall have become through some unavoidable cause permanently incapacitated prior to age 65 (as the term "permanently incapacitated" shall be defined in the administrative regulations) shall be entitled to a pension upon his retirement after February 28, 1950. Such pension for permanent incapacity shall continue only so long as such pensioner shall be permanently incapacitated. The permanency of incapacity may be verified by medical examination prior to age 65 at any reasonable time.

14. The Court finds that T.C.I. was an employer within the meaning of the Wagner Act during the mine seizure and that T.C.I. employees, including foremen, did not lose their status and rights as employees under said act by reason of the seizure or by reason of the strike.

15. The Court finds that the Wylam foremen did not demonstrate an intention to quit their employment with T.C. I. during the period April 12–23, 1945.

16. In severing the seniority of the striking foremen, T.C.I. discriminated against the men and violated their rights under the Wagner Act. In refusing to acknowledge pre-1945 service, the Trustee is relying on an illegal act.

17. The Court finds that the plaintiff has equitable rights in said trust fund based on his years of service, as do the other members of the class.

## II.  Conclusions of Law

### I.

Section 7 of the Labor Management Relations Act of 1935 (the Wagner Act) stated simply that "employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection."  An employee was defined in the Wagner Act as including "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice . . ."

During the life of the Wagner Act (1935–1947) the protection of Section 7 of the Act was construed to extend to supervisors and employees alike.[1]  The Supreme Court of the United States has upheld the N.L.R.B.'s interpretation of the Act that foremen and supervisory employees are entitled to the protection of Section 7:

> "Even those who act for the employer in some matters, including the service of standing between management and manual labor, still have interests of their own as employees. Though the foreman is the faithful representative of the employer in

maintaining a production schedule, his interest properly may be adverse to that of the employer when it comes to fixing his own wages, hours, seniority rights or working conditions.  He does not lose his right to serve himself in these respects because he serves his master in others.  And we see no basis in this Act whatever for holding that foremen are forbidden the protection of the Act when they take collective action to protect their collective interests."  Packard Motor Car Company v. N. L. R. B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

The Board's policy during the Wagner Act was that the supervisors are employees within the meaning of the Act. Union Collieries Coal Co., 41 N.L.R.B. 961, 44 N.L.R.B. 165; Godchaux Sugars, Inc., 44 N.L.R.B. 874; Packard Motor Car Co., 61 N.L.R.B. 4, 64 N.L.R.B. 1212; L. A. Young Spring & Wire Corp., 65 N.L.R.B. 298; Jones & Laughlin Steel Corp., 66 N.L.R.B. 386, 71 N.L.R.B. 1261; California Packing Corp., 66 N.L.R.B. 1461; Soss Manufacturing Co., 46 N.L.R.B. 348.

In another decision the Supreme Court held that Section 8 of the Act prohibits an employer from discriminating on the basis of union activities in its reemployment of striking employees.  N. L. R. B. v. MacKay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938):

> "The plain meaning of the act is that if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employees for the remedial purposes specified in the act."  304 U.S. at 347, 58 S.Ct. at 911.

In refusing to recognize Mr. Connell's pre-1945 service, the defendants appear to be relying on an illegal act unless some circumstance peculiar to the occasion dictates a different result.  Mr.

---

1. The Taft-Hartley Act (the Labor Management Relations Act of 1947) excluded "any individual employed as a supervisor" from the definition of employee.  Section 2(3).

Connell and his fellow foremen were at least presumptively protected from discrimination by reason of having engaged in concerted activity. In the words of the Wagner Act: "It shall be an unfair labor practice for an employer to— . . . (3) by discrimination in regard to hire or *tenure of employment* or any term or condition of employment to encourage or discourage membership in any labor organization . . ." (Emphasis added) 29 U.S.C.A. § 158(a).

### II.

█ The defendants argue that the War Labor Disputes Act of 1943 (57 Stat. 163) (hereinafter "WLDA") supersedes the Wagner Act and governs the rights of employees in plants and mines seized by the government.

The W.L.D.A. does empower the President of the United States to seize any plant or mine where an interruption of production is caused by a labor dispute and the exercise of the presidential power "is necessary to insure the operation of such plant, mine, or facility in the interest of the war effort."

Acting pursuant to power contained in the W.L.D.A., the President seized the mines, including the Wylam mine, on April 12, 1945. Executive Order 9536.

The defendants cite the case of United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947) for the proposition that T.C.I. was not an employer within the meaning of the Wagner Act during the time of the mine seizure. The argument is that the government was the employer of the Wylam foremen and that any acts done during the mine seizure, which otherwise might have been clearly illegal, were not illegal in view of the exclusion of the government from the definition of employer in the Wagner Act.

The case of United States v. U. M. W., *supra,* arose when the government acting in its own behalf sought a temporary restraining order to require all coal miners represented by the U.M.W. to return to work. The temporary restrain-ing order was attacked by the union as being invalid by reason of the prohibitions of the Norris-LaGuardia Act. The Supreme Court did not conclude that during the mine seizure, mine workers were government employees for every conceivable purpose. In fact, the Court expressly disclaimed such a purpose. The Court did find that the government stood in such a position that it could enjoin a strike in violation of the W.L.D.A. The Court did not find that the Wagner Act was superseded; nor did the Court hold that the mine operators ceased to be employers during the mine seizure. Such an anomalous result would fly in the face of the express provisions of the W.L.D.A. which went to some lengths to make clear that the mine operators were to continue to serve the company and were not to be considered employees of the government.

### III.

The Court concludes that the Wylam foremen did not become government employees for each and every purpose. The Court further concludes that T.C.I. did not cease to be an employer by reason of the seizure. Neither the War Labor Disputes Act, the Executive Orders, nor the Secretary of Interior's Regulations expressly or by implication repealed, superseded, or amended the Wagner Act. Quite the contrary is true. The W.L.D.A. provided for the use of the offices of the National Labor Relations Board in the settlement of disputes. Section 8. This Court concludes that in breaking the foremen's service, T.C.I. was acting in its managerial function and not as an agent for the government. Had T.C.I. ceased to be the "employer", as the defendants contend, then T.C.I. management would have been interfering with the seniority of the employees of the government. The Court does not feel that the case at hand calls for such result. T.C.I. was the employer for the purposes of this action.

During World War II, war contractors made arguments identical to those raised by defendants in the instant case. A

cost-plus contractor operating a government-owned plant in which all of the materials were owned by the government, and where all of the personnel were militarized, argued that a petition to hold an N.L.R.B. election should be dismissed. The contention was that the government was the employer. The Board answered:

"We have considered similar contentions in the past and found them to be without merit. The Employer exercises considerable control over the employees whom the Petitioner seeks to represent, in that it hires them, determines their rates of pay and working conditions, and discharges them. While the Employer's authority in these respects may be subjected to review by the Government in some cases, the Employer admits that its recommendations as to and control over these employees is effective. These factors are sufficient to establish an employer-employee relationship (see N. L. R. B. v. Hearst Publications, 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170, 14 LRR Man. 614]), and we have so held in previous cases. (Matter of Sinclair Rubber, Inc., 62 N.L.R.B. 1183 [16 LRR 779]; Matter of Brown Shipbuilding Company, Inc., 57 N.L.R.B. 328 [14 LRR Man. 229]).

"Nor does the fact that these employees are militarized affect our conclusion. Where an employer exercises sufficient control over its employees to establish an employer-employee relationship, as is the case here, we have held that the fact that such employees are militarized cannot serve to deprive them of their rights under the Act to be represented, if they so desire, for the purposes of collective bargaining with the employer. (Matter of B. F. Goodrich Company, 62 N.L.R.B. 206 [16 LRR Man. 192]; Matter of Rohm & Haas Company, 60 N.L.R.B. 554 [15 LRR Man. 256])."

The leading case is N. L. R. B. v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947). During the war all of the company's guards were militarized, i. e., they were sworn in as civilian auxiliaries to the military police of the United States Army. The company argued that the guards were employed by the government and did not constitute an appropriate unit for bargaining. The N.L.R.B. overruled the company and held that the guards, albeit militarized, did not lose their rights under the Act. The Sixth Circuit disagreed, but the Supreme Court affirmed. The court concluded that while performing their police functions the guards were acting as public officers; but the Court went on to point out that "it has never been assumed that such deputized guards thereby cease to be employees of the company concerned or that they become municipal employees for all purposes." The court concluded by stating that:

"But none of the Ohio cases attempts to say that the public status of special policemen destroys completely their private status as employees of individual companies. Nor is there any basis for the intimation that their public duties are such as to render incompatible the recognition of rights under the National Labor Relations Act." 331 U.S. at 431, 67 S.Ct. at 1282.

Congress enacted the War Labor Disputes Act to empower the President to take possession of any plant or mine to "insure the *operation* of such plant, mine, or facility in the interest of the war effort . . . " (Emphasis added) Section 3. Although the order contemplated criminal sanctions for interference with production (Section 6), no penalties such as loss of seniority were contemplated.[2]

Executive Order 9563 instructed the Secretary of the Interior "to operate or

2. As well, Section 6 contained the following proviso:
"No individual shall be deemed to have violated the provisions of this section by reason only of his having ceased work or having refused to continue to work or to accept employment."

arrange for the operation of such mines . . . ." Section 1. The Secretary was further instructed to "permit the management of the mines taken under the provisions of this order to *continue their managerial functions to the maximum degree possible* consistent with the aims of this order." Section 6. (Emphasis added)

The Secretary, in carrying out the Executive Order, provided that ordinarily the mines were to be operated by an "officer of the Company formerly in charge of operations who is authorized to act for the said Company . . . ." § 603.15. It was further said that the operating manager was to serve the government "but he and all other officers and employees shall serve as agents and employees of the company with respect to all actions which they would have been empowered to take on behalf of the company in the absence of Government control of its property." § 603.16. Thus, by no means did T.C.I. cease to be an employer during the seizure. The company remained "subject to the usual methods of enforcement of its obligations . . . ." § 603.22(b). While mine personnel were called upon to serve the government, the W.L.D.A. provides that "nothing in these regulations shall be construed as recognizing such personnel as officers and employees of the Federal Government within the meaning of the statutes relating to Federal employment." § 603.23(d)(1).

The mining companies were to remain subject, during the period of government control, to all federal and state laws. § 603.24. Needless to say, the Wagner Act was in effect at all times.

The right of collective bargaining was recognized provided that it did not interfere with the operation of the mine. § 603.23(b).

In this case, no interference with coal production resulted from the foremen's strike. The mines were already shut down when the foremen ceased work on April 12, 1945. When the coal miners ended their strike and went back to work the foremen also went back. However, the seniority of those responsible for the cessation of mining was not broken. The only explanation for the differing treatment is that T.C.I. sought not to insure the operation of the mines but to punish the foremen for their concerted activities. The company witness, Mr. Salter, admitted that the foremen's strike did not interfere with production in any way. Thus, severance of the foremen's seniority could not serve any legitimate seizure purpose.

The foremen were written up as having "quit without notice." Quitting is a voluntary renunciation of employment. It is a matter of intention. The foremen were on a legal and peaceful strike. By law they remained employees of T.C. I. See the definition of "employee" in the Wagner Act, Section 2(3). Their actions were altogether inconsistent with having quit. They reported to the mines each day at their regular shift starting time ready to go to work. With the exception of the severance of their seniority, the company's actions were inconsistent with deeming the foremen quitters. The foremen were reinstated for work at the same rate of pay and on the same job.

The *U. M. W.* case was a limited holding, as was acknowledged by the majority opinion.[3] The question with which they were confronted was "not whether the workers in mines under Government seizure are 'employees' of the federal Government for every purpose which might be conceived, but whether, *for the purposes of this case,* the incidents of the relationship existing between the .Government and the workers are those of governmental employer and employee." 330 U.S. at 286, 67 S.Ct. at 692. (Emphasis added.)

3. The phrase "majority opinion" may be a gross overstatement in view of the number of dissents. Four justices dissented in part and two in toto.

## IV.

A trust instrument, including labor management trusts,[4] is governed by the state law of trusts.

Trust law is clear that creation of a trust creates enforceable equitable rights in the beneficiary. Dunn v. Ponceler, 230 Ala. 375, 161 So. 450 (1935). The plaintiff and others of the class are the beneficial owners of the trust *res*. Birmingham Trust and Savings Co. v. Marx, 230 Ala. 68, 159 So. 483 (1935).

The actions of trustees are subject to judicial correction and control. Traditionally, courts of equity have inherent jurisdiction over trusts and the administration of trusts. Bibb v. Bibb, 204 Ala. 541, 86 So. 376 (1920); Dallas Art League v. Weaver, 240 Ala. 432, 199 So. 831 (1941).

██ A series of cases involving the administration of the United Mine Workers of America Welfare and Retirement Funds provides some guidance for the decision in this case. The courts have repeatedly held that the trustee's decision as to eligibility is subject to judicial review to determine "whether the trustees have acted arbitrarily, capriciously or in bad faith; that is, is the decision of the Trustee supported by substantial evidence or have they made an erroneous decision on a question of law?" Danti v. Lewis, 114 U.S.App.D. C. 105, 312 F.2d 345 (1962); see also Kosty v. Lewis, 115 U.S.App.D.C. 343, 319 F.2d 744 (1963).

In Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425 (1968) the applicant was denied benefits because, although he had enough service, his last regular employment in the industry was not with a contributing operator, as required by the trustees. The court began by stating:

"We turn now to appellants' argument that if the trustees' interpretation is lawful, the requirement itself

is not. While the trustees have broad discretion in settling eligibility requirements, there are obvious limits. Applicants could not, for example, be denied pensions because of their race or religion. See generally Steele v. Louisville & N. R. R., 323 U.S. 192, 208, 209, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (Opinion of Mr. Justice Murphy concurring). Although none of the reported cases we have found which deal with U.M.W. pension applications has directly confronted the question of court review of eligibility requirements (footnote omitted), we see no reason why the previously announced standard (to determine whether the trustees' conduct was arbitrary or capricious) should not apply. Trustees' action in prescribing eligibility requirements affects the rights of potential beneficiaries in the same vital way as do other trustees' actions." 401 F.2d at 427.

Of course, Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), is one of the landmark labor law cases. It established the general principle that labor organizations have a legal obligation to represent all their members free from hostility and arbitrary conduct.

██ Applying the general principles to this case, it is clear that the trustee has not only been guilty of arbitrary or capricious conduct but is actually relying upon a violation of the law in refusing to recognize the plaintiff's pre-strike service.

The Supreme Court of Alabama has recently upheld a trial court's conclusion that a 30-day waiting period requirement for pension eligibility was arbitrary. The trustees had enforced a rule requiring forfeiture of all survivors' rights if the worker died within 30 days following retirement. The court concluded:

"For the reasons mentioned above as to why the trial court was within

4. Section 302(c)(5)(B) of the National Labor Relations Act (29 U.S.C.A. § 186) prescribes certain limited requirements for la-

bor-management trusts but sets up no substantive federal law to govern such trusts.

its bounds of discretion in finding the classification was unreasonable, this court is constrained to the conclusion that the trial court was not plainly and palpably erroneous in its findings that the 30-day clause following the effective retirement date was not a sound and fair way to meet any need which may exist for such a provision, in view of the available alternative of a waiting period which would precede the retirement date and was therefore arbitrary since it took away earned benefits." Board of Trustees et al. v. Talley, 291 Ala. 307, 280 So.2d 553.

In Goodman v. Winn Dixie Stores, Inc., 240 So.2d 496 (Fla.App.3d 1970) the Florida District Court of Appeals held that although an employer's profit sharing plan stipulated that employee's interest was forfeited if he voluntarily resigned from employment prior to age 65, an employee did not relinquish his interest in the trust set up under the plan by engaging in a lawful strike. The terms of the profit-sharing plan provided:

"In the event that a participating employee voluntarily terminates his employment or is discharged by his employer for conduct which, in the sole discretion of the Committee, is detrimental to the best interest of his employer (except as modified by Section 7.4 below) the amount then standing to the credit of his account shall be used and disposed of as follows . . . ."

\* \* \* \* \* \*

"(d) If such employee has not attained age thirty-five (35), the entire amount or value of his account shall be forfeited."

"(3) All amounts forfeited by the termination of employment of any employee shall be allocated and credited to the accounts of the participating employees of his Employer as hereinabove provided." 240 So.2d at 498.

This is strikingly similar to the position the defendants have taken in this case.

In finding that the covered employee had in effect been discharged by the employer, the court stated:

"We are further convinced to this conclusion by the fact that the express purpose of the Employees' Profit Sharing Program was to create an estate for loyal and faithful employees who had continued for a long period of time as a part of appellant's business. It has frequently been pointed out in the construction of contracts, the intention of the parties should govern. We therefore think that it is the duty of the courts to construe this contract between the appellant and the appellee in order to effect its express intention rather than in a manner to constitute a forfeiture which the courts will ordinarily avoid. Nash Miami Motors v. Bandel, Fla.1959, 47 So.2d 701; Wash Bowl, Inc. v. Miami Coin-O-Wash No. 3, Inc., Fla.App. 1966, 184 So.2d 674." 240 So.2d at 498.

The Supreme Court of Florida has recently affirmed, 276 So.2d 465 (1973), expressly stating:

"Winn-Dixie also urges that the legal effect of the decision in the case *sub judice* is to rewrite the contract between itself and its employees. The store urges that the result is in direct conflict with Home Development Company of St. Petersburg, Inc. v. Bursani, 178 So.2d 113 (Fla.1965). However, the result of the District Court of Appeals opinion in *Goodman* is not a rewriting of the contract, but is based on two considerations of the Court:

"1. A finding that Goodman had not voluntarily terminated his employment, and

"2. An interpretation of the contract between the parties so as to 'ef-

fect its express intention rather than in a manner to constitute a forfeiture.' Goodman v. Winn-Dixie Stores, Inc., *supra*, 240 So.2d at page 498." (Rehearing denied 276 So.2d 465 [1973].)

This Florida case is extremely persuasive authority for the plaintiff's position.

In recent years, courts have begun to view employee rights to retirement funds in legal as well as equitable terms. Not only would it be a clear case of unjust enrichment were the defendants allowed to retain monies paid into the fund on the plaintiff's account, but amounts paid into the fund are in reality earnings—a form of compensation.[5] "The recognized realities inherent in such an approach are even more persuasive in regard to retirement plans, *whether bargained or not.*" Lucas v. Seagrove, *supra*, note 5. (Emphasis added.)

An employer who contributes to a pension fund receives favorable tax treatment. The costs of "qualified" plans are deductible. For the employer to receive both the tax benefits and the benefits of the employee's service and to recapture the accumulated pension credits created by a partial forfeiture, such as was imposed in this case, would be unjust.

In pension trust cases, pension plans must be construed in favor of the employees. Smith v. Union Carbide Corp., D.C.Tenn., 231 F.Supp. 980, reversed on other grounds, 6th Cir., 350 F.2d 258 (1964). Here, plaintiffs seek to have their rights to pensions under an express trust determined. This Court concludes that defendants' reliance on the defense of laches and the statute of limitations is misplaced.

▉ The Supreme Court of Alabama in Benners v. First National Bank, 247 Ala. 74, 22 So.2d 435 (1945), makes it abundantly clear that "[a]s between trustee and cestui que trust, in the case of an express trust, the statute of limitations has no application, and no length of time is a bar." 247 Ala. at 79, 22 So.2d at 439. *See* Perry on Trusts, 7th Ed., Vol. 2, § 863, p. 1468; Whetstone v. Whetstone Ex'rs, 75 Ala. 495 (1883), and Cruse v. Kidd, 195 Ala. 22, 70 So. 166 (1915). This principle was recognized by the Fifth Circuit in Hart v. First National Bank of Birmingham, 373 F.2d 202 (5th Cir. 1967). The Court concludes that plaintiff's relief is not barred by either the statute of limitations or the doctrine of laches.

▉ There are two elements involved in the defense of laches: (1) lack of diligence on the part of the plaintiff; and (2) injury to defendant due to such lack of diligence. Westco-Chippewa Pump Co. v. Delaware Electric & Supp. Co., 64 F.2d 185 (3rd Cir. 1933). In the present case, the Court finds that defendants have actually derived a benefit from the use of interest-free moneys which the defendant should have been paying into trust for this plaintiff and others similarly situated.

▉ Laches is governed by the circumstances of the particular case as well as by the court's idea of right and justice. First National Bank of Shawnee Mission v. Roeland, 357 F.Supp. 708 (D. Kan.1973). It is an equitable doctrine based on public policy to prevent enforcement of stale demands where enforcement would work an inequity, or where, due to some change of condition, enforcement would be unjust. Muscianese v. United States Steel Corp., 354 F.Supp. 1394 (E.D.Pa.1973). In weighing the equities of this case, applying laches to bar plaintiff's claim would contravene this Court's idea of right and justice.

▉ The Court recognizes that plaintiff's action could be construed as a

---

5. Lucas v. Seagrove Corporation, 277 F.Supp. 338 (D.Minn.1967); Inland Steel v. N. L. R. B., 170 F.2d 247 (7th Cir. 1948).

unilateral contract action on the pension plan itself. This approach was taken by the Seventh Circuit in Hurd v. Illinois Bell Telephone Company, 234 F.2d 942 (7th Cir. 1956). The court there dealt with a similar pension plan to the one involved in this case and held that "[t]he pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." 234 F.2d at 946. Also, it is an unimportant distinction that the pension plan is a non-contributory plan. *See* Genevese v. Martin-Marietta Corporation, 312 F. Supp. 1186 (E.D.Pa.1969); Dupree v. Gulf Oil Corporation, 328 F.Supp. 480 (E.D.Tex.1971). Under the unilateral contract theory, this Court feels that the Alabama statute of limitations of ten years for "actions founded upon any contract or writing under seal" would be applicable, since the trust agreement is under seal. Ala.Code 1940, Tit. 7, § 20. Although the Court construes the action as a suit on the express trust, the Court nevertheless feels that if there were any limitations they would begin to run against each monthly pension install-ment as a distinct cause of action under the unilateral contract theory. See Maynor v. Dillin, 241 Ala. 362, 2 So.2d 440 (1941).

This Court, in construing the pension plan most favorably for the employee, holds that the statute of limitations and the doctrine of laches do not bar plain-tiff's relief.

■ This Court also concludes that the plaintiff's attorney is entitled to a reasonable attorney's fee in an amount to be set upon completion of the case. The Court finds that plaintiff's success-ful effort has conferred "a substantial benefit on the members of an ascertain-able class." Mills v. Electric Auto-Lite, 396 U.S. 375, 393–394, 90 S.Ct. 616, 626, 24 L.Ed.2d 593; Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); Central Railroad v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885).