Joseph W. HART, Luella F. Hart and J. Carl Russell, Appellants,

v.

The FIRST NATIONAL BANK OF BIRMINGHAM, Birmingham, ALABAMA, Appellee.

No. 23181.

United States Court of Appeals Fifth Circuit.

Feb. 20, 1967.

Rehearing Denied March 27, 1967.

3. 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770.

Fyke Farmer, Nashville, Tenn., for appellants.

Leigh M. Clark, W. H. Trueman, Birmingham, Ala., for appellee, Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., of counsel.

Before TUTTLE, Chief Judge, and THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

During the war year of 1942, Joseph W. Hart and J. Carl Russell (the plaintiffs-appellants), architects residing in Nashville, Tennessee, formed the Country Club Village Corporation (Country Club) to build a 412-unit housing project in Mobile, Alabama. Country Club, by completion of construction in October, 1943, had borrowed $2,200,000 to build the project from the First National Bank of Birmingham (the defendant-appellee) and the Merchant's National Bank of Mobile. This loan was secured by the personal guaranties of Hart and Russell, by the pledge of the Country Club stock, by the pledge of certain mortgages on the property, and finally by the War Department's guaranty of 90% of the obligation.[1] Hart's and Russell's roseate hope was that F.H.A. mortgages taken by individual buyers of the homes would pay off the $2,200,000 construction loan. But this sugarplum was never more than a vision. Country Club was still insolvent at the beginning of April, 1944, about five months after

1. The War Department was authorized by Executive Order 9112, U.S.Code Cong. Service 1942, p. 268, and the First War Powers Act of 1941, 55 Stat. 838, to make such loans in order to help the war effort. Mobile was badly in need of housing at the time, owing to the impact of the war on its industry.

completion of construction; on April 6, 1944, the banks and Hart and Russell signed an agreement by which the banks took full title to the stock of Country Club, except that Hart and Russell were given a year to redeem their Country Club stock by paying off the excess of the $2,200,000 loan over the receipts from the sale of the individual units. Hart and Russell were retained as managers of Country Club so that they could work to sell the units and thereby reduce the deficit.

The F.H.A. mortgages which were realized totaled more than $2,000,000, but this was not sufficient, and in October, 1944, the banks found it necessary to request the War Department to make good on its guaranty. The War Department, through the Federal Reserve Bank of Atlanta, then paid the banks 90% of the then current deficiency of $183,345.-55.

In April, 1945, when the year's agreement between Hart and Russell and the banks expired, the deficiency still existed (although it apparently had been reduced), and Hart and Russell lost their right to regain the Country Club stock, although of course they still remained liable on their personal guaranties.

Shortly after the expiration of the one-year agreement, the banks sold the subdivision to R. B. Ellinor for $37,140. (Ellinor then proceeded to realize a profit of $375,000 in selling the individual units over a ten-year period.) The banks assigned the $2,200,000 note (still guaranteed by Hart and Russell) to the United States. On November 6, 1956, the United States sued Hart and Russell for $83,900.63 plus interest, which sum represented the final deficiency in repayment of the loan. A judgment for the United States (rendered January 29, 1962) was upheld on appeal. United States v. Hart, 6 Cir. 1963, 312 F.2d 127. One of the issues involved in that suit was the fairness of the sale to Ellinor.

Hart and Russell filed the present suit on November 5, 1962, against the First National Bank of Birmingham. The district court in an exhaustive opinion, granted summary judgment for the defendant First National. We affirm.

This case consists entirely of an attempt by Hart and Russell to hold First National liable because the sale of the property to Ellinor was for allegedly insufficient consideration. We hold that this attempt to question a sale made seventeen years before this action was started is barred by the Alabama statute of limitations and cannot now be raised.

The relevant portions of the Alabama statute set up a six-year period for all simple contracts and for any trespass to personal property (Alabama Code, Title 7, § 21 (Recomp. 1958));[2] and declare

2. "§ 21. (8944) (4835) (2796) (2615) (3226) (2901) (2477)
Limitation of six years.—The following must be commenced within six years:
Actions for any trespass to person or liberty, such as false imprisonment, or assault and battery.
Actions for any trespass to real or personal property.
Actions for the detention or conversion of personal property.
Actions founded on promises in writing not under seal.
Actions for the recovery of money upon a loan, upon a stated or liquidated account, or for arrears of rent due upon a parol demise.
Actions for the use and occupation of land.
Motions and other actions against the sureties of any sheriff, coroner, constable, or any public officer, or actions against the sureties of executors, administrators, or guardians, for any nonfeasance, misfeasance, or malfeasance, whatsoever, of their principal; the time to be computed from the act done or omitted by their principal, which fixes the liability of the surety.
Motions and other actions against attorneys at law, for failure to pay over money of their clients, or for neglect or omission of duty.
Actions founded upon judgments obtained before justices of the peace of this state.
Actions upon any simple contract or speciality, not herein specifically enumerated."

that the statute applies to both legal and equitable cases (Title 7, § 31).[3]

■■■ The plaintiffs make three contentions on appeal. The first is that the sale of the land to Ellinor itself gave plaintiffs no right of action because what was pledged was the stock in Country Club, rather than the land sold. Plaintiffs argue that since the subject matter of the pledge was not sold, there was no suit which they could then have brought. Thus, they argue, the statute of limitations could not have started to run, and did not start to run until, at the earliest, the United States filed suit against them on November 6, 1956 (one day less than six years before the present suit was filed). This argument assumes that Alabama law exalts form over substance in refusing to note that the sale of the land for insufficient consideration would destroy the value of the pledged stock, but that assumption is not valid. " * * * [I]f plaintiff's *equitable or other rights,* though short of a legal title, *have been injured or destroyed by defendant* in possession as pledgee, in violation of the terms of the pledge agreement, plaintiff may sue in case." May v. Stallings, 1944, 245 Ala. 292, 295, 16 So.2d 870, 872. [emphasis added]. See Lauderdale County Co-Op v. Lansdell, (1954) 260 Ala. 452, 71 So.2d 70; Stanley v. People's Savings Bank, 1934, 229 Ala. 446, 157 So. 844. We hold that if there was a cause of action in the present case, it arose upon the sale of the land to Ellinor, which allegedly destroyed the value of the pledged stock.

■■ The plaintiff's other contentions involve the likening of this pledge relationship, either implicitly or explicitly, to an express trust. The rabbit which the plaintiffs seek to pull out of this hat is the rule, recognized in Alabama, that the statute of limitations does not run

between the beneficiary of an express trust and his trustee while the trust relationship lasts. Benners v. First National Bank, 1945, 247 Ala. 74, 22 So.2d 435.

The plaintiffs claim that the April 6, 1944, agreement actually created an express trust, with the banks as trustees and themselves as beneficiaries.

The short answer is that the 1944 agreement just does not create a trust. Professor Scott, after eschewing attempts at detailed definition of all the characteristics of trusts,[4] does distinguish between mortgages and trusts:

"The interest of a mortgagee is a security interest. He holds the interest for his own benefit and not for the benefit of the mortgagor. A trustee, on the other hand, has an interest in the trust property which he holds for the beneficiaries, and not for his own benefit. A mortgagee cannot be compelled to surrender his interest in the mortgaged property until the debt secured by the mortgage is paid or otherwise discharged. A trustee has no such interest in the trust property as to permit him to prevent the termination of the trust, if there is no other reason for continuing the trust." 1 Scott, Trusts § 9 at 81 (2d ed. 1956). See also § 9 at 83.

It is quite clear, of course, that the agreement in question here did benefit the banks, because in return for giving Hart and Russell the extra year to redeem their stock, the banks secured their services in selling the properties and in reducing thereby the debt owed the banks. The moratorium on redemption did not put the banks in trust bondage. And, of course, the banks could not be compelled to relinquish their interest in the pledged property until the debt was paid.[5]

---

3. "§ 31. (8955) Applies to all courts.— This article shall apply to and govern both courts of law and courts of equity, whether the claim asserted be legal or equitable debts or obligations. (1915, p. 547.)"

4. See 1 Scott, Trusts § 2.3 at 36–7 (2d ed. 1956).

5. Paragraph 8 of the Agreement reads: "8. Hart and Russell, or either of them, may at any time during the period speci-

These distinguishing points show that this agreement did not create a trust, as its most salient features place it on the mortgage side of Professor Scott's discussion. See Gordon v. Central Park Little League, 1960, 270 Ala. 311, 119 So.2d 23; Teal v. Pleasant Grove Local Union No. 204, 1917, 200 Ala. 23, 75 So. 335; Restatement (Second), Trusts §§ 2, 9 (1959). One cannot become a refugee from the statute of limitations by calling a transaction a trust.

The plaintiffs' remaining argument is nowhere clearly stated except conclusorily in their original brief.

"There has been no voluntary surrender of all interest in the stock by the owners supported by sufficient consideration and free from oppression and undue advantage. Neither has there been an adverse possession by the pledgee *brought home to the knowledge or notice of the pledgor* which would start the statute of limitations running." Appellants' Brief p. 27. [emphasis added].

In other terms, this argument says that in a continuing pledge relationship a cause of action arising because the pledgee used the pledge adversely to the pledgor does not start the statute of limitations running until "brought home to the knowledge or notice of the pledgor." The plaintiffs then place the date at which such knowledge or notice was brought home to them at November 6, 1956 (again, the date when the United States sued them and, again, one day short of six years prior to their filing of suit in the present case).

Neither the logic nor the experience of Alabama law supports this position. This was a commercial real estate transaction, characterized by arm's length negotiations from its promotional start to its economic collapse. Yet plaintiffs argue that in such a situation they, as pledgors, were able to relax and wait for news of alleged malfeasance of their pledgee to trickle back to them before they had to bestir themselves to protect their own interests.

The plaintiffs rely heavily on Keeble v. Jones, 1914, 187 Ala. 207, 65 So. 384. In that case, Keeble pledged an insurance policy on his life, along with certain mortgages, as security for a loan from Jones in 1890. Then Jones, in 1892, foreclosed on the mortgages and applied their proceeds to the debt, so that after these foreclosures the pledged policy was worth substantially more than the remaining debt. More than twenty years after the pledge, Keeble sought to redeem it by tendering the sum due. Jones claimed that the passage of time had vested title to the policy in him. The Alabama Supreme Court, through Justice Sayre, held that Keeble could redeem, because nothing had happened during the twenty years to affect the nature of the pledge.

" * * * Absolutely nothing has occurred to affect the relation between the parties, except that, when appellee foreclosed his mortgages, he received a sum or sums of money that went to relieve in part the lien upon appellant's property. There is no appearance of matter that might be urged in defense, as that there has been a foreclosure in any sort, or a call upon appellant to redeem, or any denial of the right of redemption until recently. * * * " 187 Ala. at 214, 65 So. at 387.

The portion of Keeble v. Jones on which plaintiffs rely stands only for the notion that where the subject matter of the pledge was inert, and neither party did anything at all to change position over the years, no cause of action arose.

fied in paragraph 11 of the agreement pay to Banks in cash the amount of indebtedness stated in the preceding paragraph plus accrued interest and expenses, as aforesaid, and Banks shall thereupon release Hart and Russell from their liability as endorsers and guarantors and deliver without warranty and without expense to Banks as Hart and Russell may jointly direct, all the stock mentioned in the preceding paragraph in exchange for receipts and releases in form and substance satisfactory to counsel for Banks."

Justice Sayre distinguished the cases in which the pledgee disposes of the pledged property or in some way acts adversely to the pledgor. In such cases, as in the present, the cause of action arises on the sale or adverse behavior of the pledgee. Keeble v. Jones actually stands for the opposite of what the appellants cite it for,[6] and other cases hold that on a wrongful act of a pledgee vis-a-vis his pledgor, the statute of limitations begins to run immediately. In Keeble v. Jones itself, the Court said, in discussing cases where the pledgee's sale yielded more than the debt due,

> "In all cases the overplus of proceeds, after payment of the debt secured, belongs to the pledgor, and may be recovered by an action for money had and received; *the statute of limitations beginning to run against such action from the time of the receipt of the money.*" 187 Ala. at 212, 65 So. at 386. [emphasis added]

In Campbell v. Woodstock Iron Co., 1887, 83 Ala. 351, 361, 3 So. 369, 371–372, the Court said,

> " * * * [I]f it be admitted that there were irregularities in the [foreclosure] sale, which rendered the transfer of the stock tortious and wrongful, the mortgagee would be guilty of a conversion * * *. *And this right of action would be barred at law in six years from the date of the sale.*" [7]

This rule is expressed in Restatement (Second) Trusts § 9, Comment d (1959):

> "§ 9. A mortgage or a pledge or a lien is not a trust."

And see 4 Scott, Trusts § 481.1 at 3150–3152 (2d ed. 1956).

Conversely, the cases distinguish between express trusts and trusts created by operation of law (constructive trusts) and limit strictly the exception tolling the statute of limitations to cases involving express trusts. In Veitch v. Woodard Iron Co., 1917, 200 Ala. 358, 76 So. 124, the Court explained that the exception for express trusts comes from the peculiar identity of interest between an express trustee and his beneficiary:

> "Looking to the further rules of limitations that affect the rights of a cestui que trust under the two classes of trusts, express or constructive, the settled law in this state is that, as between the cestui que trust and the trustee, no lapse of time will bar the former of his remedy for a breach of the trust. The privity existing between them makes the possession of the one, the possession of the other; and hence there is no adverse title. The fraud inherent in the breach of such trust estops the trustee perpetrating the same from denying the possession of the cestui que trust through him as such trustee. * * *
>
> "A different rule prevails where the trustee of an express trust has conveyed the trust estate to a purchaser with knowledge or notice, in which case the purchaser has impressed upon him the character of a constructive trustee; yet the lapse of time operates to bar the beneficiary of his remedy against such constructive trustee. * * * " 200 Ala. at 362, 76 So. at 128.

The exception has not been extended to any constructive trust, no matter how compelling the case. In American Bonding Co. v. Fourth National Bank, 1921, 205 Ala. 652, 88 So. 838, the guardian of

6. The Alabama Supreme Court has held that the pledgor must act "with diligence" to discover the relevant facts in cases where the pledgee has sold the pledged goods to himself and the pledgor seeks to avoid the sale. See, e. g., Persons v. Russell, 1925, 212 Ala. 506, 103 So. 543. While such cases involve setting aside a sale to a third party and thus are distinguished from cases like the present (where the pledgor seeks to hold the pledgee liable in damages), still the opinions smack of the atmosphere of the commercial arm's length transaction, rather than that of trust, confidence, and reliance of one party on another.

7. For these purposes, mortgage law is analogous to pledge law (at least in cases, like the present, where title to the pledged property is in the pledgee). See, e. g., Lauderdale County Co-Op. v. Lansdell, 1954, 260 Ala. 452, 71 So.2d 70.

a minor misappropriated the minor's funds and deposited them in his personal account in the Fourth National Bank of Montgomery. The guardian then became bankrupt, and his bonding company made good the loss to the ward, became subrogated to the ward's rights, and sued the bank, averring that the bank had had notice of the misappropriation of the funds. The bank demurred to the bill, and its defense of the statute of limitations was successful. The Court held:

"It is sought by counsel for complainant to bring the case from without the general rule as to the statute of limitations by showing that the facts alleged constitute such a trust relationship as against a breach of which the statute of limitations presents no bar. It cannot be contended under the averments of this bill that there are any elements of an express trust as between Estelle Manegold and the bank. McCarthy v. McCarthy, 74 Ala. 546.

"It is not pretended that the bank in any manner ever declared itself the trustee of funds shown to have been recovered in this suit, or at any time recognized the rights of Estelle Manegold to these funds. We think it clear therefore that, if the bank is a trustee at all, it was such in invitum or the trustee of a constructive trust.

"It is well recognized that constructive trusts are within the operation of the statute of limitations. * * *" 205 Ala. at 656, 88 So. at 842.

In Spann v. First National Bank of Montgomery, 1941, 240 Ala. 539, 200 So. 554, guardian sought to rescind illegal investments which she innocently bought from the defendant bank. The bank was held to be a constructive trustee only, and the statute of limitations was a good defense.

Perhaps most convincingly, Blythe v. Enslen, 203 Ala. 692, 85 So. 1, held that the duty of the director of a bank to the bank and its stockholders was not the duty of an express trustee, but of a constructive trustee, and the statute of limitations was held to be a bar.

Finally, Alabama expressly places a pledgee outside of the category of an express trustee. Persons v. Russell, 1925, 212 Ala. 506, 103 So. 543. This is the general rule. "A mortgage or a pledge or a lien is not a[n express] trust." Restatement (Second), Trusts § 9 (1959).

The rule is not a harsh one. It demands only that a pledgor give the same attention to his affairs which the six-year statute demands for all simple contracts. Contracts of pledge, like other contracts, cannot be alchemized into trusts when seventeen years have inexplicably passed.

Finally, if the plaintiffs did not discover the sale to Ellinor because the banks fraudulently concealed the sale, Alabama Code, Title 7, § 42 (Recomp. 1958) extends the statute of limitations when there has been fraudulent concealment of any right of action. The period for suit in such instances of concealment is extended to run for one year from and after the date of notice or discovery of the fraudulent concealment. Mere ignorance of the cause of action is not sufficient to invoke this provision. Peters Mineral Land Co. v. Hooper, 1922, 208 Ala. 324, 94 So.2d 606; Fletcher v. First National Bank of Opelika, 1943, 244 Ala. 98, 11 So.2d 854; Hudson v. Moore, 1940, 239 Ala. 130, 194 So. 147. This is the provision which gives aid when ordinary diligence fails to uncover a cause of action. But a year's grace has long since passed, for the plaintiffs were surely advised of the nature of the sale to Ellinor when they were sued by the United States on November 6, 1956. The plaintiffs did not either seek to bring the banks into that suit or sue the banks in an independent action. This statute gave them until November 6, 1957, to try to do so. Their current suit was filed on November 5, 1962. It is too late. Seventeen years' sleep on a cause of action has provided a justifiedly rude awakening.

Affirmed.